## BEST *v.* POLK.

1. The treaty of May 24th, 1834, with the Chickasaw Indians (7 Stat. at Large, 450) conferred title to the reservations contemplated by it, which was complete when the locations were made to identify them.
2. A patent (as often decided before) is void which attempts to convey lands previously granted, reserved from sale, or appropriated.
3. Reservees under the treaty above named are not obliged, in addition to proving that the locations were made by the proper officers, to prove also that the conditions on which these officers were authorized to act had been observed by them.
4. Copies of records appertaining to the land office, certified by the register of the district where they are, are evidence in Mississippi.
5. An officer commissioned to hold office during the term of four years *from* the 2d of March, 1845, is in office *on* the 2d of March, 1849. The word "from" excludes the day of date.

ERROR to the District Court for the Northern District of Mississippi; the case being thus:

By virtue of a treaty made October the 20th, 1832,* the Chickasaw Nation of Indians, in the belief that it was better to seek a home west of the Mississippi, ceded their lands to the United States, who agreed to survey and sell them on the same terms and conditions as the other public lands, and to pay the proceeds to the nation. In order, however, that the people of the tribe should not be deprived of a home until they should have secured a country to remove to, they were allowed, after the survey and before the first public sale of their lands, to select out of the surveys a reasonable settlement for each family, and to retain these selections as long as they were occupied. After this occupation ceased the selected lands were to be sold and the proceeds paid to the nation.

On the 24th of May, 1834, a little more than a year after the date of the first treaty, another treaty† was made with these Indians, essentially changing the provisions of the former one. These changes were made owing to the supposed inability of the Chickasaws to obtain a country within the

---

* 7 Stat. at Large, 381.                    † Ib. 450.

territorial limits of the United States adequate to their wants, and to the desire expressed by them to have within their own direction and control the means of taking care of themselves. Accordingly they abandoned the idea of selecting, out of the surveys, lands for temporary occupancy, and, in lieu thereof, reservations of a limited quantity were conceded to them. The scheme embraced the whole tribe—heads of families as well as all persons over twenty-one years of age, male and female, who did not occupy that relation. The sixth article of the treaty reserved a section of land to each of this latter class of Indians, a list of whom, within a reasonable time, seven chiefs (named in the treaty) were to make out and file with the agent. On this officer certifying that the list was believed to be accurate, the register and receiver were to cause the locations to be made.

In this state of things, the United States, on the 13th of March, 1847—reciting that one James Brown had paid, " according to the provisions of two several treaties with the Chickasaw Indians, dated October 20th, 1832, and May 24th, 1834," &c., for the section 23, in township 5, of range 11 west, in the district of lands subject to sale at Pontotoc, Mississippi, containing, &c., "according to the official plat of the survey returned into the General Land Office by the surveyor-general, which said tract has been purchased by the said James Brown"—granted the section of land described to the said Brown in fee.

Brown granted it to one Polk. Hereupon, a certain Best being in possession, Polk sued him in ejectment. The defendant set up that prior to the issuing of the patent to Brown the section had been located to an Indian, named Bah-o-nah-tubby, of the Chickasaw Nation, under the terms of the second treaty, and that he held under the said Indian.

On the trial the defendant offered in evidence a paper certified by one A. J. Edmondson, styling himself register of the land office of the United States at Pontotoc, Mississippi, to be " a true copy of the roll, number, reserves, and locations under the sixth article" of the treaty between the United States and Chickasaw Indians, &c., " and of the list

of persons furnished by the Chickasaw agent to the register and receiver as Indians entitled to land under said article." The paper ran thus:

*Reservations under the sixth article of the Chickasaw treaty.*

| No. | Reserve. | S. | T. | R. | Date. |
|-----|----------|-----|-----|------|-------|
| 774 | Tah-pin-tah-umby. | 7 | 6 | 11 W | June 17, 1839. |
| 775 | Chah-caw-mubby. | 10 | 5 | 11 " | "    "    " |
| **776** | **Bah-o-nah-tubby.** | 28 | 5 | 11 " | "    "    " |

The certificate of Edmondson to this exhibit was dated March 2d, 1849, while the commission of Edmondson himself, which was produced and put in evidence by the other side, was dated on March 2d also, four years previously; and appointed him register of the land office at Pontotoc "during the term of four years *from* the 2d day of March, 1845."

The plaintiff objected to the paper offered in evidence, upon the ground that it did not purport to be a copy of the record of the land office; that the certificate was not authorized by any act of Congress; that it stated facts and legal conclusions; that it did not show that the list was made by the person named in the articles of the treaty, or that the agent certified to its believed accuracy; that it was not founded on any order of survey, donation, pre-emption, or purchase; that it did not purport to be a copy of the plat of the general office; that it could not be set up to defeat a patent; that the present action being one of ejectment the legal title alone was involved, and that such title could only pass by a patent; that a patent could not be impeached at law except for defects apparent on its face; that the treaties did not convey the title in fee to the Indian Bah-o-nah-tubby, for the section of land sued for, but that the title remained in the United States till it passed out by patent.

The court decided that the paper was incompetent, and verdict and judgment having been rendered for the plaintiff, the defendant brought the case here, assigning for error the exclusion of the paper.

*Mr. T. J. D. Fuller, in support of the ruling below :*

In addition to the reasons taken on the trial for the rejection of the paper—reasons here iterated and relied on—it may be urged:

1. That the contemplated reservees were unknown and uncertain persons till designated and fixed in a prescribed manner and on specific proofs. The certificate offered in evidence should have therefore shown, in addition to what it did show (if it showed anything), that a list including Bah-o-nah-tubby was furnished by the " seven chiefs," in accordance with the sixth article of the treaty to the agent, and that he certified to the receiver and register that he believed it accurate.

2. The paper offered was not authenticated in the manner prescribed by statute. It should have been certified by the Commissioner of the Land Office, under the seal of the Department of the Interior, accompanied with the *survey, maps,* and *reservations marked* thereon, as they must be if the record exists.*

3. The paper was inadmissible, because the officer certifying, and at the time he certified, was not in office. The day of the date of his commission is to be included within the computation of the four years. His office, or term of office, expired on the night of March 1st, 1849. And such is understood to be the practice and holding of the government. It is in analogy to the rule of law for computing time under the statute of limitations.

4. The paper, if competent for any purpose, could be so for one purpose only, and that was to disprove seizin of the plaintiff. But the defendant offered no evidence to connect himself with the alleged outstanding title.

*Mr. J. W. C. Watson, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

In order to carry out in good faith Indian treaties, effect

---

* See act of January 23d, 1823, 3 Stat. at Large, 721; 10 Id. 297; and Brightly's Digest, 267 and footnotes.

must be given to the intention of the parties to them; and
from the different provisions of the treaties which are appli-
cable to this case, no well-founded doubt can exist of the
proper construction to give to the sixth article. The cession
in the first treaty contemplated the ultimate abandonment
of the lands by the Indians. This treaty did not prove satis-
factory, and the Indians asked, and the United States con-
ceded to them, a limited quantity of land for a permanent
home. This object could not be obtained if it were meant
to give only an equitable title to the Indians. Such a title
would soon become complicated by the encroachments of
the white race; and that the Indians supposed they were .
providing for a good title to their " reservations" is manifest
enough, because they declare, in the second treaty, that they
wish to have the management of their affairs in their own.
hands.

This disposition, which was natural under the circum-
stances, the United States yielded to, and agreed, when the
body of the lands were surveyed, to reserve from sale certain
limited portions on which the reservations should be located.
This was done in obedience to a just policy, for it would
have been wrong, considering the dependent state of these
Indians, to hold them to their original engagement. The
United States could not afford to do this, and, therefore,
willingly consented to re-cede to the Indians enough lands
for their wants. Can it be doubted that it was the intention
of both parties to the treaty to clothe the reservees with the
full title? If it were not so there would have been some
words of limitation indicating a contrary intention. Instead
of this there is nothing to show that a further grant, or any
additional evidence of title, were contemplated. Nor was
this necessary, for the treaty proceeded on the theory that a
grant is as valid by a treaty as by an act of Congress, and
does not need a patent to perfect it. We conclude, there-
fore, that the treaty conferred the title to these reservations,
which was complete when the locations were made to iden-
tify them. This was the view taken of this subject by the
highest court of Mississippi soon after this treaty went into

operation, in litigations which arose between the white race and the Indians themselves concerning the effect to be given to these reservations.*　In all these cases the Indian reservee was held to have preference over the subsequent patentee, on the ground that the United States had parted with the title by the treaty.　These decisions, furnishing a rule of property on this subject in Mississippi, were not brought to this court for review, as they could have been, but have been acquiesced in for a quarter of a century.　To disturb them now would unsettle titles *bonâ fide* acquired.

It has been repeatedly held by this court that a patent is void which attempts to convey lands that have been "previously granted, reserved from sale, or appropriated."† "It would be a dangerous doctrine (say the court in *New Orleans v. United States*‡) to consider the issuing of a grant as conclusive evidence of right in the power which issued it.　On its face it is conclusive, and cannot be controverted; but if the thing granted was not in the grantor no right passes to the grantee.　A grant has been frequently issued by the United States for land which had been previously granted, and the second grant has been held to be inoperative."

If, therefore, the location of the land in controversy was properly made, the legal title to it was consummated, and the subsequent patent was unauthorized.　And this brings us to the consideration of the question whether the evidence on the subject of the location ought to have been received by the court.

This evidence consists of the certificate of the register of the land office at Pontotoc that the reserve of a Chickasaw Indian (naming him) was located on the disputed section in June, 1839, under the provisions of the sixth article of the Chickasaw treaty, and a copy of the roll, number, reserve,

---

* Wray *v.* Doe, 10 Smedes & Marshall, 461; Newman *v.* Doe, 4 Howard (Mississippi), 555; Niles et al. *v.* Anderson et al., 5 Id. 365; Coleman *v.* Doe, 4 Smedes & Marshall, 46.

† Stoddard *v.* Chambers, 2 Howard, 284; United States *v.* Arredondo, 6 Peters, 728; Reichart *v.* Felps, 6 Wallace, 160.

‡ 10 Peters, 731.

and location is given, showing this to be the case. It is
insisted that this certificate did not go far enough; that it
ought to have shown that a list, including this Indian, was
furnished by the seven chiefs to the agent, and that the
agent cert'fied to the register and receiver, prior to the loca-
tion, that he believed the list to be accurate. If this were
so no presumption could arise that local land officers,
charged with the performance of a duty, had discharged it
in conformity with law.

It would be a hard rule to hold that the reservees under
this treaty, in case of contest, were required to prove not
only that the locations were made by the proper officers, but
that the conditions on which these officers were authorized
to act had been observed by them. Such a rule would im-
pose a burden upon the reservees not contemplated by the
treaty, 'and, of necessity, leave their titles in an unsettled
state. The treaty granted the land, but the location had to
be fixed before the grant could become operative. After
this was done, the estate became vested and the right to it
perfect, as much so as if the grant had been directly exe-
cuted to the reservee. It has been frequently held by this
court that a grant raises a presumption that the incipient
steps required to give it validity have been taken.*

The grant, in this case, was complete when the location
was made, and the location is, in itself, evidence that the
directions of the treaty on the subject were observed, and it
cannot be presumed that the officers empowered to make
the location violated their duty. Even if the agent neglected
to annex a proper certificate to the roll of Indians entitled
to the reservations, it is difficult to see how the Indians
could be prejudiced by this neglect. We conclude, there-
fore, that the certificate of the register was competent evi-
dence, and if the locations were not as there stated, it is
easy for the plaintiff below to show that fact. The same
effect was given to a similar certificate of this same officer,

---

* Polk's Lessee *v.* Wendell, 5 Wheaton, 293; Bagnell *v.* Broderick, 13
Peters, 436.

by the High Court of Errors and Appeals of Mississippi, as early as 1848, in an action of ejectment brought by a Chick-asaw Indian, for a tract of land claimed by him in virtue of a location made in his behalf as a reservee, against a party claiming by patent subsequent in date to the location of his reservation. And this decision was reaffirmed by the same court in 1854, in the case of another Indian suing for his land under similar circumstances.* It must have been supposed at the time by the losing parties that these decisions were correct, or else the opinion of this court would have been asked on the point involved. After such a length of acquiescence, it would produce great mischief to hold this evidence to be incompetent.

It is objected that the paper offered in evidence should have been certified by the Commissioner of the General Land Office; but this was not necessary, for copies of records appertaining to the land office, certified by the register, are evidence in Mississippi, and 'similar statutes exist in nearly all the Western and Southwestern States.†

Another objection is taken to the certificate of Edmond-son, on the ground that when it was given his term of office had expired. This objection cannot be sustained, for the certificate bears date the 2d March, 1849, and he was commissioned to hold the office of register " during the term of four years from the 2d day of March, 1845." The word " from " always excludes the day of date.‡

It is argued that in ejectment a stranger to the outstanding title cannot invoke it to defeat the action. Whether this be so or not depends on the laws of the State; but the point does not arise in this case, for there was no opportunity for the defendant to connect himself with the Indian title after the court refused to let the evidence on the subject of this title go to the jury.

---

* Wray *v.* Doe, 10 Smedes & Marshall, 452 ; Hardin *v.* Ho-yo-ho-Nubby's Lessee, 27 Mississippi, 567.

† See Revised Code of Mississippi.

‡ See 1 Parsons on Notes and Bills, 385, and the authorities therein cited.

The decision respecting this evidence necessarily disposed of the case.

JUDGMENT REVERSED, and a

VENIRE DE NOVO AWARDED.