## DOOLAN *v.* CARR.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF CALIFORNIA.

No. 34. Argued October 24, 25, 1887. — Decided November 21, 1887.

The proper Circuit Court of the United States has jurisdiction, irrespective of the citizenship of the parties, of an action in ejectment, in which the controversy turns upon the validity of a patent of land from the United States.

Want of power in an officer of the Land Office to issue a land patent may be shown in an action at law by extrinsic evidence, although the patent may be issued with all the forms of law required for a patent of public land.

Land within the limits of a valid Mexican grant (which grant was *sub judice* when the grant of public land in aid of the Pacific Railroads was made by the act of July 1, 1862, as amended July 2, 1864, and March 3, 1865), if found after the location of the railroads to be within the prescribed limits on either side of them, did not pass to the corporations as "public

land," if it was described by specific boundaries; or if it was known or described by a name by which it could be identified; but if it was described as a specific quantity within designated outboundaries containing a greater area, only so much land within the outboundaries as is necessary to cover the specific quantity granted was excluded from the grant to the railroad companies.

Official documentary evidence of a Mexican grant which has been confirmed by the proper authorities of the United States, is admissible on the trial of an action in ejectment, to show a want of power in the Land Office to issue a patent for the same land as "public land" under the statutes granting "public land" to aid in the construction of the Pacific Railroads.

It would seem also that parol testimony is admissible to identify the land as coming within the terms of the grant.

EJECTMENT. Verdict for the plaintiff and judgment on the verdict. Defendants sued out this writ of error. The case is stated in the opinion.

*Mr. Michael Mullany* for plaintiffs in error cited: *Newhall v. Sanger*, 92 U. S. 761; *Kansas Pacific Railroad v. Dunmeyer*, 113 U. S. 629, 642; *Rosecrans v. Douglass*, 52 Cal. 213; *Leavenworth &c. Railroad v. United States*, 92 U. S. 733; *Wilcox v. Jackson*, 13 Pet. 498, 509; *Easton v. Salisbury*, 21 How. 426; *Hissel v. St. Louis Public Schools*, 18 How. 19; *Reichart v. Felps*, 6 Wall. 160; *Polk v. Wendall*, 9 Cranch, 87; *Carr v. Quigley*, 57 Cal. 394; *McLaughlin v. Powell*, 50 Cal. 64; *McLaughlin v. Fowler*, 52 Cal. 203; *Robinson v. Forest*, 29 Cal. 317; *Parker v. Duff*, 47 Cal. 554; *Kernan v. Griffith*, 27 Cal. 87; *Kernan v. Griffith*, 31 Cal. 462; 34 Cal. 580; *Knight v. Roche*, 56 Cal. 15; *Summers v. Dickinson*, 9 Cal. 554; *Doll v. Meador*, 16 Cal. 295; *Connecticut Ins. Co. v. Schaeffer*, 94 U. S. 457; *United States v. Minor*, 114 U. S. 233, 240; *Terry v. Megerle*, 24 Cal. 609; *S. C. 85 Am. Dec. 84*; *Lytle v. Arkansas*, 9 How. 314; *Cunningham v. Ashley*, 14 How. 377; *Schulenberg v. Harriman*, 21 Wall. 44; *Sherman v. Buick*, 93 U. S. 209, and cases cited; *Patterson v. Weim*, 11 Wheat. 380; *Jackson v. Lawton*, 10 Johns. 23; *S. C. 6 Am. Dec. 311*; *Langdean v. Hanes*, 21 Wall. 521; *Wright v. Roseberry*, 121 U. S. 488.

*Mr. Walter H. Smith* (with whom were *Mr. A. T. Britton* and *Mr. A. B. Browne* on the brief) for defendant in error cited: *Gold Washing Company v. Keyes*, 96 U. S. 199; *Reich-*

*art* v. *Felps*, 6 Wall. 160; *Quinn* v. *Chapman*, 111 U. S. 445; *Turnpike Road* v. *Myers*, 6 S. & R. 12; *Baptist Church* v. *Mulford*, 3 Halsted (8 N. J. L.), 181; *Darnell* v. *Dickens*, 4 Yerg. 7; *Burrill* v. *Nahant Bank*, 2 Met. 163; *S. C.* 35 Am. Dec. 395; *Commercial Bank* v. *Kortwright*, 22 Wend. 348; *S. C.* 34 Am. Dec. 31; *Lovett* v. *Steam Saw Mill*, 6 Paige, 54; *Reed* v. *Bradley*, 17 Ill. 321; *Johnson* v. *Towsley*, 13 Wall. 72; *Frend* v. *Fyan*, 93 U. S. 169; *Ehrhardt* v. *Hogeboom*, 115 U. S. 67; *Shepley* v. *Cowan*, 91 U. S. 330; *Moore* v. *Robbins*, 96 U. S. 530; *United States* v. *Schurz*, 102 U. S. 378; *Quinby* v. *Conlan*, 104 U. S. 420; *Smelting Co.* v. *Kemp*, 104 U. S. 636; *Moore* v. *Wilkinson*, 13 Cal. 478; *Beard* v. *Federy*, 3 Wall. 478; *Steel* v. *Smelting Co.*, 106 U. S. 447.

MR. JUSTICE MILLER delivered the opinion of the court.

William B. Carr, the defendant in error, brought his action of ejectment in the Circuit Court of the United States for the District of California against James Doolan and James McCue, to recover possession of 320 acres of land, described as "the east half of section 27, township 2, range 1 East of the Mount Diablo base and meridian, of the public land surveys of the United States of America, in the State of California," and he had judgment for the land.

No citizenship of either party is alleged, and this is urged as a ground of reversal in this court, to which the case has been brought by a writ of error. It, however, appears very clearly that the controversy turns upon the validity of the patent from the United States under which plaintiff claims title, and which was denied by the defendants. The Circuit Court for the District of California, therefore, had jurisdiction of the case as one arising under the Constitution and laws of the United States within the meaning of the act of March 3, 1875. 18 Stat. 470.

On the trial before the jury the plaintiff introduced in evidence a patent from the United States to the Central Pacific Railroad Company for the land in question, among many other tracts, dated February 28, 1874. This patent purported to be issued under "the act of Congress approved July 1st, 1862, as amended by the act of July 2d, 1864, to aid in the construction

of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the government the use of the same for postal, military, and other purposes, and the act of March 3d, 1865," and in accordance with the laws of the State of California, by which the Central Pacific Railroad Company and the Western Pacific Railroad Company were consolidated. Although the introduction of this patent was objected to by the defendants, it appears upon its face to be valid, and it was therefore properly admitted as evidence. The plaintiff also introduced a deed of conveyance from the Central Pacific Railroad Company to himself, and, after further evidence as to the use and occupation of the land, its value, and that the amount in controversy was over ten thousand dollars, rested.

The defendants, thereupon, in order to show that the patent to the railroad company was issued without authority of law, and therefore void, offered evidence to show "that on, to wit, April 10, A.D. 1839, the Mexican government granted to José Noriêga and Robert Livermore a certain tract of land known by the name 'Las Pocitas,' and which embraced all the land within the following boundaries, viz.: Bounded on the north by the Lomas de las Cuêvas, on the east by the Siêrra de Buenos Ayres, on the south by the dividing line of the establishment of San José, and on the west by the rancho of Don José Dolores Pacheco, containing in all two square leagues, provided that quantity be contained within the said boundaries; and if less than that quantity be found to be contained therein, then that less quantity and all of said described tract of land.

"That the departmental assembly of the Mexican nation confirmed said grant to said Noriêga and Livermore on, to wit, May 22d, 1840.

"That on, to wit, February 27th, 1852, said Noriêga and Livermore petitioned to the board of land commissioners appointed under the provisions of the act of Congress, approved March 3d, 1851, entitled 'An act to ascertain and settle the private land claims in the State of California,' to have said grant confirmed, and on, to wit, the 14th day of February, A.D. 1854, the said board of land commissioners confirmed the same

to said Noriêga and Livermore, their heirs and assigns, and the decree of confirmation so made to said Mexican grant by said board of land commissioners described the boundaries thereof to be: On the north by the Lomas de las Cuêvas, on the east by the Sierra de Buenos Ayres, on the south by the dividing line of the establishment of San José, and on the west by the rancho of Don José Dolores Pacheco, provided that within the same no greater quantity than two square leagues were found to be contained; and if a less quantity should be found therein, then that less quantity was confirmed and all of said described tract of land.

"That the United States District Court for the Northern District of California, on appeal to it from said decree of the board of land commissioners, duly confirmed said Mexican grant on, to wit, February 18th, A.D. 1859, to the same extent and by the same description, and under the same conditions as said board of land commissioners had done, and the Supreme Court of the United States, at the December term, A.D. 1860, affirmed the said decree of said United States District Court and every part thereof.

"That during the year 1865 an official survey of the lands so confirmed to said Noriêga and Livermore was made by or under the directions of the surveyor general of the United States for the State of California, and which was duly approved by said surveyor general in the year A.D. 1866, and which survey included the half section of land described in the complaint herein; that said survey was set aside by the Secretary of the Interior in the year A.D. 1868, and a new survey ordered to be made of said Mexican grant within the boundaries set forth in said decrees, which should contain but two square leagues of land, or thereabouts.

"That in March, 1869, the United States surveyor general for California caused the said Mexican grant to be surveyed and designated in accordance with the claims thereof and within the boundaries set forth in said decrees of confirmation, the amount so segregated consisting of about two square leagues, in accordance with the said order of the Secretary of the Interior, and said survey was approved by said surveyor

general on, to wit, May 11th, 1870; and the said survey was approved by the Commissioner of the General Land Office on, to wit, March 1st, 1871; and said survey was finally approved by the Secretary of the Interior on, to wit, June 6th, 1871, and on said last-named date the surplus (or sobrante) of the land embraced within the boundaries contained in said grant and in said decrees became freed and discharged from the claims and reservation of said Mexican grant, and became public land of the United States and a part of the public domain thereof.

" That the entire half section of land described in the complaint herein is located and embraced within the boundaries stated and tract described in and confirmed by the said decree of the board of land commissioners of the United States District Court and of the Supreme Court of the United States, but it was not included within the tract so surveyed in March, 1869, and finally approved on June 6th, A.D. 1871, as aforesaid, as the final survey of said Mexican grant, and said half section of land described in the complaint herein was held and claimed as a part and parcel of said Mexican grant, and was reserved as such continually from the 10th day of April, A.D. 1839, down to the 6th day of June, A.D. 1871, and on said last-named day it became for the first time public land of the United States.

" That the line of the road of said Western Pacific Railroad Company of California was definitely fixed under the provisions of said act of Congress on, to wit, the 30th day of January, 1865, under and within the intent and meaning of the provisions of the act of Congress of July 1st, 1862, entitled ' An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean,' and the act amendatory thereof and supplemental thereto; and that on the 31st day of January, 1865, the lands within the limits designated by said acts of Congress as being granted to said railroad company were withdrawn from preëmption, private entry, and sale under the provisions of said acts, and that no part of the lands described in the complaint has been taken or used for any depot, shop, switch, turn-out or road-bed of

said railroad or of said railroad company; that said railroad was completed prior to the year 1870."

The plaintiff objected to the proof thus offered to be made by the defendants, and to other proof not material to the point now under consideration, on the ground "that the United States patent cannot be collaterally attacked in this action; that it can be attacked by bill in equity only; that the said United States patent and the recitals therein contained are conclusive evidence in this action that the legal title of the lands therein described was granted and transferred by the United States to the grantee named in said patent, and, taken in connection with the deed from the railroad company to the plaintiff, is conclusive evidence of the plaintiff's right to recover."

The court sustained the objection, and refused to allow said proof, or any part of it, to be made, to which the defendants excepted. The court then charged the jury that " the patent title to this land to the Central Pacific Railroad Company is conclusive in this case. It cannot be attacked in a collateral manner. If it can be attacked at all it is only by a direct proceeding for the purpose of vacating the patent; and, without further remark upon this, one way or the other, it may be sufficient to say that I charge you the law is that, so far as this case is concerned, the patent from the government to the railroad company, the first patent introduced here, is conclusive of the rights of the parties in this case."

To this charge the defendants excepted, and the case before us turns upon the correctness of the ruling of the court on the proposition that in this action at law none of the evidence offered by the defendants could be received to impeach the validity of the patent, and that such an issue as that attempted to be raised by the defendants could only be made by a suit in equity to set it aside.

There is no question as to the principle that where the officers of the government have issued a patent in due form of law, which on its face is sufficient to convey the title to the land described in it, such patent is to be treated as valid in actions at law, as distinguished from suits in equity, subject,

however, at all times to the inquiry whether such officers had the lawful authority to make a conveyance of the title. But if thos officers acted without authority; if the land which they purported to convey had never been within their control, or had been withdrawn from that control at the time they undertook to exercise such authority, then their act was void — void for want of power in them to act on the subject-matter of the patent, not merely voidable; in which latter case, if the circumstances justified such a decree, a direct proceeding, with proper averments and evidence, would be required to establish that it was voidable, and should therefore be avoided. The distinction is a manifest one, although the circumstances that enter into it are not always easily defined. It is, nevertheless, a clear distinction, established by law, and it has been often asserted in this court, that even a patent from the government of the United States, issued with all the forms of law, may be shown to be void by extrinsic evidence, if it be such evidence as by its nature is capable of showing a want of authority for its issue.

The decisions of this court on this subject are so full and decisive that a reference to a few of them is all that is necessary. *Polk's Lessee* v. *Wendall*, 9 Cranch, 87; *New Orleans* v. *United States*, 10 Pet. 662, 730; *Wilcox* v. *Jackson, dem. McConnell*, 13 Pet. 498, 509; *Stoddard* v. *Chambers*, 2 How. 284, 317; *Easton* v. *Salisbury*, 21 How. 426, 428; *Reichart* v. *Felps*, 6 Wall. 160: *Best* v. *Polk*, 18 Wall. 112, 117; *Leaven worth Railroad* v. *United States*, 92 U. S. 733; *Newhall* v. *Sanger*, 92 U. S. 761; *Sherman* v. *Buick*, 93 U. S. 209; *Smelting Co.* v. *Kemp*, 104 U. S. 636; *Steel* v. *Smelting Co.*, 106 U. S. 447; *Kansas Pacific Railway Co.* v. *Dunmeyer*, 113 U. S. 629, 642; *Reynolds* v. *Iron Silver Mining Co.*, 116 U. S. 687.

The case of *Polk's Lessee* v. *Wendall* is, perhaps, the earliest one in this court where this subject received full consideration. That was an action of ejectment in the Circuit Court of the United States for the Western District of Tennessee. On the trial, the plaintiff, who was also the plaintiff in error, introduced and relied upon a patent from the State of North Carolina, of the date of April 17, 1800, which included the land in controversy.

The defendant then offered in evidence a patent issued by the same State, dated August 28, 1795, which also included the land in dispute. The reading of this prior patent was objected to, but, the objection being overruled, the patent was read in evidence. Testimony was then offered to impeach it, and it is upon this branch of the subject that the opinion of the court, delivered by Chief Justice Marshall, is pertinent. After considering the many guards which the statutes provide to secure the regularity of grants and the incipient rights of individuals, as well as to protect the state from imposition, he expresses the view, in language the substance of which has been often since repeated, that, in general, a court of equity appears to be a tribunal better adapted to the object of examining into objections to a patent which affect its validity than a court of law. He then says: " In general, then, a court of equity is the more eligible tribunal for these questions; and they ought to be excluded from a court of law. But there are cases in which a grant is absolutely void; as where the state has no title to the thing granted; or where the officer had no authority to issue the grant. In such cases, the validity of the grant is necessarily examinable at law." p. 99.

In that case, the court held that it could be shown, as a defence to the patent, that the entries on which it was granted were never made, and that the warrants were forgeries; in which case no right accrued under the act of 1777, and, no purchase of the land having been made from the State, the grant was void by the express words of the law, and that in rejecting the testimony on this point the Circuit Court erred. The judgment was, therefore, reversed.

The case of *Wilcox* v. *Jackson* was an action of ejectment brought against Wilcox, the commanding officer at Fort Dearborn, to recover possession of land held by him in that character. This land was entered under a preëmption claim by one Beaubean, who paid the purchase money and procured the register's receipt therefor. He afterwards sold and conveyed his interest to the lessor of the plaintiff. The question was, whether the register's certificate, which seems to have been treated as sufficient evidence of title if it was valid, could be

impeached by testimony that the land was not subject to entry. In the opinion of the Supreme Court on this subject the language used in *Elliott* v. *Peirsol*, 1 Pet. 328, 340, is quoted with approval:

"Where a court has jurisdiction it has a right to decide every question which occurs in the cause; and whether its decision be correct or otherwise, its judgment, until reversed, is regarded as binding in every other court. But if it act without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void."

The court then proceeds: "Now, to apply this. Even assuming that the decision of the register and receiver, in the absence of fraud, would be conclusive as to the facts of the applicant then being in possession, and his cultivation during the preceding year, because these questions are directly submitted to them; yet if they undertake to grant preëmptions in land in which the law declares that they shall not be granted, then they are acting upon a subject-matter clearly not within their jurisdiction; as much so as if a court whose jurisdiction was declared not to extend beyond a given sum should attempt to take cognizance of a case beyond that sum." p. 511.

In *Stoddard* v. *Chambers*, which was an action of ejectment, an attempt was made to show that the defendant's patent was void. This court said in that case:

"The location of Coontz was made in 1818, and his survey in 1818. At these dates there can be no question that all land claimed under a French or Spanish title, which claim has been filed with the recorder of land titles — as the plaintiffs' claim had been — were reserved from sale by the acts of Congress above stated. This reservation was continued up to the 26th of May, 1829, when it ceased, until it was revived by the act of 9th July, 1832, and was continued until the final confirmation of the plaintiffs' title by the act of 1836. The defendant's patent was issued the 16th of July, 1832. So that it appears that when the defendant's claim was entered, surveyed, and patented, the land covered by it, so far as the location interferes with the plaintiffs' survey, was not 'a part of the public land authorized to be sold.' On the above facts the important ques-

tion arises, whether the defendant's title is not void. That this is a question as well examinable at law as in chancery will not be controverted. That the elder legal title must prevail in the action of ejectment is undoubted. But the inquiry here is, whether the defendant has any title as against the plaintiffs. And there seems to be no difficulty in answering the question, that he has not. His location was made on lands not liable to be thus appropriated, but expressly reserved; and this was the case when his patent was issued. . . . No title can be held valid which has been acquired against law, and such is the character of the defendant's title, so far as it trenches on the plaintiffs'. . . . The issuing of a patent is a ministerial act, which must be performed according to law. A patent is utterly void and inoperative which is issued for land that had been previously patented to another individual. . . . The patent of the defendant having been for land reserved from such appropriation, is void; and also the survey of Coontz, so far as either conflicts with the plaintiffs' title."

These principles were recognized in and governed the decision of the court in *Easton* v. *Salisbury*.

In *Reichart* v. *Felps*, which was an action of ejectment, the plaintiff claimed under two patents, of the dates of 1838 and 1853, which the court says "exhibit conclusive evidence of title if the land had not been previously granted, reserved, or appropriated." This was permitted to be proved by the patent of Governor St. Clair, dated February 12, 1799, duly registered in 1804, with a survey made in 1798. This was held to be conclusive evidence that the land was so reserved, and defeated the patents of 1838 and 1853.

In *Best* v. *Polk* the plaintiff, in support of his title in an action of ejectment, produced a patent from the United States, dated March 13, 1847, which seemed in all respects to be regular, granting the section of land described to James Brown in fee, who conveyed to Polk. The defendant, Best, being in possession, attempted to defeat this patent by showing that the land in question was reserved under the treaties of 1832 and 1834 with the Chickasaw Nation of Indians, which authorized members of the tribe who desired to do so, and heads

of families, to locate lands, which when so located were to be reserved from sale or other disposition by the United States. The defendant undertook to show that the land on which he was settled, which was the subject of controversy, had been properly located by an Indian, and was therefore not liable to sale at the time that Brown purchased it of the land officers. The court below rejected the evidence because of certain deficiencies in the certificate made by one Edmondson, a register of the land office at Pontotoc, who certified that the land in question was located as a reserve by a Chickasaw Indian, under the treaty, in July, 1839. This court reversed the judgment rendered in favor of plaintiff in the court below, holding that the certificate was sufficient, and that it showed that under the treaty, and by the action of the Indian in settling upon it, and procuring a certificate of that fact from the proper officer, the land had become reserved in the language of the treaty, and that the patent under which the plaintiff claimed was therefore void: citing also *Polk's Lessee* v. *Wendell*, and *Bagnell* v. *Broderick*, 13 Pet. 436.

In the case of *Reynolds* v. *Iron Silver Mining Co.*, 116 U. S. 687, decided last year, which was an action to recover possession of part of a vein or lode of mineral deposit, plaintiff relied on a patent for a placer mine, and the contested vein was within the lines of its superficial area extended perpendicularly. The statute on which this patent was issued declared that it should not confer any right to veins known to exist within it at the time the grant was made. Defendants offered evidence to show that the vein in controversy was known to the patentee to exist at the time of his application for the patent.

The Circuit Court charged the jury that because the defendants had shown no right whatever to the vein, but were in possession as naked trespassers, they could not, in defence of that possession, show this defect in plaintiff's title. But this court (the Chief Justice dissenting) held that this ruling was erroneous, and that, as in all other actions of ejectment, plaintiff must recover on the strength of his own title, and not on the weakness of defendants'.

With the principles so well established by these decisions, of the right in an action at law to prove by competent extrinsic evidence that a patent of the United States is void for want of power in the officers to issue it, and the facts which show that want of power, we come to the case of *Newhall* v. *Sanger*, 92 U. S. 761, which establishes the proposition that land covered by a Mexican claim was not public land within the meaning of the act of Congress making the grant to the railroads, but was reserved from the granting clause of those statutes.

In *Leavenworth, Lawrence &c. Railroad* v. *United States*, 92 U. S. 733, decided at the same time with *Newhall* v. *Sanger*, the opinions in both cases being delivered by Mr. Justice Davis, the question of the right to show this want of authority was also very fully discussed. That was a case in which the railroad company had brought suit in equity to establish its title to tracts of land lying within the Osage country, in Kansas, which had been certified to the governor of that State as part of the grant made by Congress to aid in the construction of certain railroads. This was done by the supposed authority of the act of March 3, 1863, 12 Stat. 772, granting every alternate section of land in the State of Kansas, designated by odd numbers, for ten sections in width, on each side of said road, and of each of its branches.

It also contained the usual reservation, that in case it should appear when the line or route of said railroad and branches was definitely fixed, that the United States had sold any of the land granted, or that the right of preëmption or homestead settlement had attached to the same, then the right was given to select other lands; and it provided that any and all lands theretofore reserved to the United States by the acts of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatever, " be, and the same are hereby, reserved to the United States from the operation of the act."

The route of the road in that case was located through lands which had belonged to the Osage Indians, and to which their title was not extinguished until September 29, 1865. This court held that, notwithstanding the generality of the granting

clause, it was not intended by that statute to grant anything but *public* lands of the United States at the date of the grant, and that the reservation clause was sufficient to except these lands, then in the possession of the Indians, out of the grant, even if the general language could be construed to include them. The court says: " A special exception of this land was not necessary in these grants, because the policy which dictated them confined them to land which Congress could rightfully bestow, without disturbing existing relations and producing vexatious conflicts. The legislation which reserved it for any purpose, excluded it from disposal as the public lands are usually disposed of." ·

In the case of *Newhall* v. *Sanger* the object of the suit was to determine the ownership of a quarter section of land in California. The patent under which the appellee claimed was issued in 1870, under the act of 1862 granting lands to railroad companies for the purpose of constructing a railroad to the Pacific Ocean. 12 Stat. 489, 492. One of the companies was the Western Pacific Railroad Company, to which was granted every alternate section of *public land*, designated by odd numbers, within ten miles on each side of its road, not sold, reserved, or otherwise disposed of by the United States, and to which a homestead or preëmption claim may not have attached at the time the line of the road was definitely fixed. The act also declared, as in other cases, that it should not defeat or impair any preëmption, homestead, swamp land, or other lawful claim, nor include any government reservation or mineral lands, or the improvements of any *bona fide* settler. The appellant asserted title under a patent of the United States of later date, which recited that the land was within the exterior limits of a Mexican grant called Moquelamos, and that a patent had, by mistake, been issued to the company. It was conceded that the land in controversy fell within the limits of the railroad grant as enlarged by the amendatory act of 1864, 13 Stat. 356, 358, the same act now under consideration, " and the question arises," said the court, " whether lands within the boundaries of an alleged Mexican or Spanish grant, which was then *sub judice*, are public within the meaning of the acts of Congress ·

under which the patent whereon the appellee's title rests was issued to the railroad company."

It will be seen that this is the precise question presented in the case under consideration, and the court, referring to the preceding case of *Leavenworth, Lawrence &c. Railroad* v. *United States*, 92 U. S. 733, and reciting the fact that in that case they confined a grant of every alternate section of "*land*" to such whereto the complete title was absolutely vested in the United States, proceeds : " The acts which govern this case are more explicit, and leave less room for construction. The words ' public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws. That they were so employed in this instance is evident from the fact that to them alone could the order withdrawing lands from preëmption, private entry, and sale apply." The court then goes on to show that the status of lands included in a Spanish or Mexican claim pending before tribunals charged with the duty of adjudicating it, was such that the right of private property could not be impaired by a change of sovereignty, and that such lands were not included in the phrase " public lands " of these specific railroad grants, and that until such claims were finally decided to be invalid they were not restored to the body of public lands subject to be granted.

These Mexican claims were often described, or attempted to be described, by specific boundaries. They were often claims for a definite quantity of land within much larger outboundaries, and they were frequently described by the name of a place, or ranche. To the extent of the claim when the grant was for land with specific boundaries, or known by a particular name, and to the extent of the quantity claimed within outboundaries containing a greater area, they are excluded from the grant to the railroad company. Indeed, this exclusion did not depend upon the validity of the claim asserted, or its final establishment, but upon the fact that there existed a claim of a right under a grant by the Mexican government, which was yet undetermined, and to which therefore the phrase " public lands," could not attach, and which the statute did not include, although it might be found within the limits prescribed on each side of the road when located.

It is objected that the testimony offered in the present case, and rejected by the court below, to prove the facts concerning the Mexican grant which would defeat the patent to the railroad company, is parol, and that even conceding the right to assail the patent in an action at law founded on the title conveyed by it, this cannot be done by parol testimony. But without deciding in this case how far such testimony can be received in an action at law for that purpose, it is sufficient to say that the evidence rejected by the court below in the present case is entirely documentary and matter of record, being the written evidence of the grant by the Mexican government, of its confirmation by the Land Commission of California, of the affirmance of the award of that commission by the District Court of the United States, and by this court, and of the record of the two surveys made by the surveyor of the United States, the latter confirmed by the Commissioner of the General Land Office, showing the location and confirmation of the Mexican grant, and the dates at which all those transactions occurred. We do not doubt that this evidence was admissible for the purpose for which it was offered, and if any oral testimony were necessary to identify the land in controversy as coming within the Mexican grant, and the surveys of the Land Office, under the decisions of the courts, we do not think it would be inadmissible, although it is not clear that any such was necessary or was offered.

For the radical error of the court in rejecting this evidence and in the instructions given to the jury on the same point,

*The judgment is reversed, and the case remanded to the Circuit Court for a new trial.*

Mr. Chief Justice Waite dissenting.

I feel compelled to withhold my assent to this judgment. The ground of my dissent is not that in a proper case the validity of a patent of the United States for the conveyance of lands may not be attacked in a suit at law by proving that it was issued without the requisite authority, but that this is not a proper case for the application of that rule. To show that I

recognize the existence of the right to make such proof, if the person who offers it is in a position to do so, it is only necessary to refer to *Simmons* v. *Wagner*, 101 U. S. 260, where, as the organ of the court, I announced its decision, that one in possession under a certificate issued by a proper officer in the regular course of his official duty, showing that he had bought and paid for the land, might successfully defend an action of ejectment brought against him by the holder of a patent issued upon an entry by another party made long after his rights accrued; and this because, after the purchase under which he was in possession the land was no longer a part of the public domain, and the officers of the United States had no authority in law to sell it a second time.

In my opinion, however, such proof can only be made by one who holds a right at law or in equity which is prior in time to that of the patentee, or by one who claims under the United States by a subsequent grant or some authorized recognition of title. Unless I have misinterpreted the cases on this subject, that has always been the doctrine of this court.

In *Polk's Lessee* v. *Wendall*, 9 Cranch, 87, the controversy was between two persons, one holding under a patent issued by the State of North Carolina, dated August 28, 1795, and the other under another patent for the same land, issued by the same State, dated April 17, 1800, and the question was, whether as against the second patent the first was good. In *Wilcox* v. *Jackson*, 13 Pet. 498, the defendant was an officer of the United States, in possession of a military post under the authority of the government, and the plaintiff was the holder of certificates of the register and receiver of the proper land office, showing that he had bought and paid for the land under a preëmption entry. The officer in possession, holding under and for the United States, was allowed to prove that at the time of the entry and purchase the land had been reserved from the mass of public lands, and that its sale by the officers of the government was unauthorized and void. In *Stoddard* v. *Chambers*, 2 How. 284, the controversy was between one claiming under a Spanish grant and a patentee under the location of a New Madrid certificate. The confirmation of the

grant was not made until after the location, but as the right of the grantee was prior in time to that of the New Madrid claimant, he was permitted to show that the land was reserved from sale, and consequently the location of the certificate was unauthorized, and the patent thereunder invalid. In *Easton* v. *Salisbury*, 21 How. 426, the question arose upon substantially the same facts, and was decided in the same way. In *Reichart* v. *Felps*, 6 Wall. 160, the holder of a French settler's claim, recognized in the grant by Virginia to the United States of the northwest territory, and confirmed or patented by Governor St. Clair, under the act of June 20, 1788, was permitted to contest the validity of patents issued by the United States for the same land, one in 1838 and one in 1853, on the ground that the land had "been previously granted, reserved from sale, or appropriated," and therefore the patents were inoperative and void. In *Best* v. *Polk*, 18 Wall. 112, the parties were the holder of a title under a treaty of the United States with the Chickasaw Nation of Indians and a junior patentee. The holder of the elder title was permitted to show that when the claim was made under which the subsequent patent was issued, the land had been, "previously granted, reserved from sale, or appropriated," and consequently no title could be acquired under it. In *Newhall* v. *Sanger*, 92 U. S. 761, one side claimed under a patent issued upon the same railroad grant that is involved in the present suit, and the other under a subsequent patent which recited that "the land was within the exterior limits of a Mexican grant called Moquelamos, and that a patent had, by mistake, been issued to the [railroad] company." Such a junior patentee was allowed in that suit to contest the validity of the elder patent to the company. The case of *Leavenworth, Lawrence and Galveston Railroad* v. *United States*, 92 U. S. 733, was a suit brought by the United States against the railroad company to quiet its title to lands claimed by the company under a land grant. That of *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629, so much relied on, presented the question as between the claimant under a railroad grant and the holder of a patent from the United States issued on a homestead entry made subsequently. *Sher-*

*man* v. *Buick*, 93 U. S. 209, was between the holder of a
patent of the United States and the holder of a patent from
the State of California, claiming under a prior grant from the
United States of the same land for school purposes. *The
Smelting Company Cases*, 104 U. S. 636, and 106 U. S. 447,
were between those claiming under a patent for a placer min-
ing claim and certain occupants of lots in the town site of
Leadville which had been reserved from sale prior to the loca-
tion of the claim. In *Reynolds* v. *Iron Silver Mining Com-
pany*, 116 U. S. 687, the question was not one of admitting
proof to invalidate a patent, but as to the legal effect of a
patent for a placer mining claim, and it was held not to in-
clude veins or lodes within the boundaries of the claim as
located on the surface and extended vertically downwards, if
known to exist when the patent was issued. In *Wright* v.
*Roseberry*, 121 U. S. 488, decided at the last term, one party
held under a conveyance by the State of California of a tract
of land which the State claimed under the grant by the United
States of swamp and overflowed lands, and the other under a
patent from the United States issued upon a preëmption entry.
Many more cases of a similar character might be cited, but it
is needless to pursue them further. They establish beyond all
question that, if one holds under an older title, or if he is in a
position under a junior claim to represent the title of the gov-
ernment, he may attack the validity of a patent in a suit at
law on the ground that it was issued without proper authority.

On the other hand, it seems to me equally well settled, that
if he who seeks to contest the patent is a volunteer, a mere
intruder, he will not be heard. Thus, in *Hoofnagle* v. *Anderson*,
7 Wheat. 212, the contest was between the holders of two
Virginia military land warrants, who had made their entries
on the same tract of land. One entered and got his patent
eighteen months before the other located his warrant. At the
trial the holder of the junior warrant sought to show that the
former grant was " obtained contrary to law, being founded on
a warrant which was issued by fraud or mistake;" but Chief
Justice Marshall, in delivering the opinion of the court, said:
" The title of the respondent to the particular tract included

in his patent was complete before that of the appellants commenced. It is not doubted that a patent appropriates land. Any defects in the preliminary steps, which are required by law, are cured by the patent. It is a title from its date, and has always been held conclusive against all those whose rights did not commence previous to its emanation. Courts of equity have considered an entry as the commencement of title, and have sustained a valid entry against a patent founded on a prior defective entry, if issued after such valid entry was made. But they have gone no farther. They have never sustained an entry made after the date of the patent. They have always rejected such claims. The reason is obvious. A patent appropriates the land it covers; and that land, being no longer vacant, is no longer subject to location. If the patent has been issued irregularly, the government may provide means for repealing it; but no individual has a right to annul it, to consider the land as still vacant, and appropriate it to himself." pp. 214, 215. This seems to me to be the true rule; and one way the government may adopt to annul a patent which has been issued without authority of law, is to grant the land to another, and thus clothe the new grantee with its own power to test the validity of the former proceedings to divest it of title. Such a grantee will thus be made to represent the United States by authority, and he may sue for the land. With such a title, or something equivalent to it, the courts may properly, as has been done heretofore, allow him to assert his own title, that is, the title of the government, against one which was apparently granted before. Such an attack on the title would be direct, not collateral, as authority to proceed had been given by the government for that purpose.

In *Cooper* v. *Roberts*, 18 How. 173, the suit was brought by one holding title under a patent of the State of Michigan conveying a tract of what was claimed to be school land, against one who had got into possession under a lease by the Secretary of War for mining purposes. The title of the State was adjudged to be good as against the United States and the defendant in possession. The defendant then objected to the plaintiff's right of recovery because "the officers of the State

violated the statutes of Michigan in selling the lands, after they were known, or might have been known, to contain minerals." As to this, Mr. Justice Campbell, speaking for the court, p. 182, said: "Without a nice inquiry into these statutes, to ascertain whether they reserve such lands from sale, or into the disputed fact whether they were known, or might have been known, to contain minerals, we are of opinion that the defendant is not in a condition to raise the question on this issue. The officers of the State of Michigan, embracing the chief magistrate of the State, and who have the charge and superintendence of this property, certify this sale to have been made pursuant to law, and have clothed the purchaser with the most solemn evidence of title. The defendant does not claim in privity with Michigan, but holds an adverse right, and is a trespasser upon the land to which her title is attached. Michigan has not complained of the sale, and retains, so far as this case shows, the price paid for it. Under these circumstances we must regard the patent as conclusive of the fact of a valid and regular sale on this issue."

So in *Field* v. *Seabury*, 19 How. 323, the same rule appears. There it was said that the question whether a grant from a sovereignty or by legislative authority was obtained by fraud was exclusively between the sovereignty making the grant and the grantee. It seems to me clear that the same rule applies to questions of illegality. The case of *Spencer* v. *Lapsley*, 20 How. 264, is equally significant. There the question was as to the validity of a Mexican grant, and the court refused to investigate the fairness of the grant at the instance of one who had "entered without a color of title," and in so doing said, again speaking through Mr. Justice Campbell: "Neither the State of Coahuila and Texas, nor the Republic of Texas, nor the State of Texas, has taken measures to cancel this grant, nor have they conferred on the defendant any commission to vindicate them from wrong: He is a volunteer. The doctrines of the court do not favor such a litigant."

The last case in this court to which I will refer in the present connection is *Ehrhardt* v. *Hogaboom*, 115 U. S. 67. There the suit was brought by one claiming title under a patent of the

United States issued to a preëmption settler, against one who contended the patent was void because the lands were, at the time of the preëmption entry, swamp and overflowed lands which passed to the State of California under an act of Congress passed in 1850. As a defence to the action the defendant offered to prove the character of the land, but we held this offer was properly denied because he was, as to the land in dispute, "a simple intruder, without claim or color of title. He was, therefore, in no position to call in question the validity of the patent of the United States, . . . and require the plaintiff to vindicate the action of the officers of the Land Department in issuing it."

In some of the state courts the same ruling has been made. Thus, in *Crommelin* v. *Minter*, 9 Alabama, 594, before the Supreme Court of Alabama in 1846, it was decided that "a patent fraudulently obtained, or which has issued in violation of law, is void, and does not authorize a recovery against a party in possession under color of title. But a mere intruder cannot insist on the invalidity of the patent." And so in *Doll* v. *Meador*, 16 Cal. 295, it was held by the Supreme Court of California, in 1860, that "a patent, not void upon its face, cannot be questioned, either collaterally or directly, by persons who do not show themselves to be in privity with a common or paramount source of title;" and the court, in delivering its opinion, was careful to say, "the point here is as to the *status* of the party who can raise any question as to its [the patent's] validity, when it is regular on its face."

I cannot but believe this is the true doctrine. If the government is satisfied with what has been done, all others must be; and it will be deemed in law to be satisfied, unless it proceeds itself to correct the error or authorizes some one else to do so.

It only remains to consider what position Doolan and McCue occupy in this litigation. The land was patented to the Central Pacific Railroad Company February 28, 1874, and the railroad company conveyed to Carr, the plaintiff below, June 10, 1874. No attempt has been made by the United States, so far as this record discloses, to annul the patent. On the 10th of November, 1882, Doolan and McCue each entered on 160

acres of the land under a claim of preëmption settlement. Each of them then made and subscribed a declaratory statement of his intention to claim and preëmpt the land on which he had settled under the laws of the United States, and presented it to the register of the proper land office; but he refused to receive it on the ground of the existence of the patent to the railroad company. This is all the claim of title which they have; but the decisions are uniform to the effect that what had thus been done conferred on them no rights as against the United States. Certainly it gave them no right to represent the United States in a suit to avoid the patent which had been issued.

In *Frisbie* v. *Whitney*, 9 Wall. 187, it appeared that in March, 1862, this court decided that what had been supposed to be a valid Mexican grant of the Soscol Ranch was void for want of authority in the Mexican government to make it. At the time of this decision Frisbie was in possession of the quarter section involved in the suit under the Mexican title. Whitney afterwards took forcible possession of the same quarter section and claimed to hold it as a settler under the preëmption laws of the United States. He applied to the proper land officers to make his declaration under the statute but they refused to receive it. On the 3d of March, 1863, Congress passed an act, c. 116, 12 Stat. 808, by which the *bona fide* purchasers under the Mexican title were allowed to buy the lands from the United States. Frisbie availed himself of this statute and got his patent. Whitney then sued him for a conveyance of the legal title because of the alleged superior equity which he, Whitney, had acquired by his preëmption settlement. This court however decided that a settlement on the public lands of the United States, no matter how long continued, conferred no right against the government, and, it was added, "the land continues subject to the absolute disposing power of Congress until the settler has made the required proof of settlement and improvement and has paid the requisite purchase money." For this reason the title of Frisbie was sustained and the bill dismissed. The *Yosemite Valley Case*, 15 Wall. 77, is to the same effect.

It has also been held that a right of preëmption can never be acquired by intrusion upon the actual possession of another. *Trenouth* v. *San Francisco*, 100 U. S. 251; *Atherton* v. *Fowler*, 96 U. S. 513. In the present case, Carr alleges that he was in possession when the entry was made by Doolan and McCue, and this is not denied except by saying that Carr was not ousted at any time while he was the owner of the land.

As these parties have received from the government no recognition of their preëmption entries, therefore, and have not paid the purchase money, they stand before the law as mere volunteers and intruders on the possession of the patentees. They do not and cannot represent the title of the United States as against the patent, and are not entitled to be heard in opposition to it. As to them, in their present situation, the land was as much segregated from the public domain by the issue of the patent as it would have been if there were no dispute about the authority for its issue.

To show that Congress has been accustomed to treat such preëmption settlers as mere intruders and entitled to no consideration by the government, it is only necessary to refer to the act for the relief of purchasers of parts of the Soscol Ranch, just cited, and the act passed March 3, 1887, c. 376 24 Stat. 556, which directs the Secretary of the Interior immediately to adjust, in accordance with the decisions of this court, each of the land grants made by Congress to aid in the construction of railroads, and theretofore unadjusted, and to demand from the several companies a relinquishment of their title to all lands that had been erroneously certified or patented. It there provides, § 4, that if any of the lands so erroneously certified or patented, with a few specified exceptions, have "been sold by the grantee company to citizens of the United States, or to persons who have declared their intention to become such citizens, the person or persons so purchasing in good faith, his heirs or assigns, shall be entitled to the land so purchased, upon making proof of the fact of such purchase at the proper land office, within such time and under such rules as may be prescribed by the Secretary of the Interior, after the grants respectively shall have been adjusted; and patents

of the United States·shall issue therefor, and shall relate back to the date of .the· original certification or patenting, and the Secretary of the Interior, on behalf of the United States, shall demand payment from the company which has so disposed of such lands of an amount equal to the government price of similar lands; and in case of neglect or refusal of such company to make payment as¯hereafter specified, within ninety days after the demaṇd shall have been made, the Attorney-General shall cause suit or suits to be brought against such company for the said amount."

I cannot believe that one whose claim to rights under the laws of the United States is·thus ignored by Congress in·what was decided in *Frisbie* v. *Whitney, ubi supra,* to be valid legislation, can avail himself of a want of authority in the officers of the government to issue a patent, which is valid on its face, to protect himself. against eviction from the patented land on which he has entered as a trespasser, and without any color of title.