Howry, J.,
delivered the opinion of the court:
This is a motion by the claimant for a new hearing (and treated as such by consent) and to amend certain findings of fact found by the court and filed under an act approved February 24,1905. (33 Stats., 808; 42 C. Cls. R., 385.)
Strictly speaking there is no new testimony, but some additional matter has been officially certified from the public records and considered.
As these issues have been twice presented in elaborate oral arguments, supplemented by printed brief and manuscript reference at great length, the court has become familiarized with the many details, and with the correction of certain errors of statement, unimportant, to be sure, the case will now be finally acted on. Accordingly the findings now substituted, though not materially different from those heretofore reported, will supersede previous statements of fact, not alone because the additional matter certified since the former hearing has imposed the obligation to recast the facts, but also because, as now reported, the findings deal less with detail and conform more nearly to the rule applicable to this court by making the findings a summary of propositions which the evidence is intended to establish. This has imposed difficulties jarobably never contemplated by Congress, because it has been impossible to avoid the statement of certain details.
The court has also filed an opinion applying the law to the facts to avoid misunderstandings. This has been all the more necessary because rights are claimed under decisions which can not be embodied in the findings. Though it is conceded by claimant’s counsel that an opinion from the court may accompany findings in a certain class of cases it *79 is not thought by the counsel that this case is within that class. We think, however, it is. Every court has a right to give reasons for its official action, and it is such a cardinal rule of Anglo-Saxon jurisprudence the principle has been extended to commissions, boards, and quasi-judicial bodies. The jurisdictional act does not exclude an opinion, which would be remarkable if it did, because if the questions here presented do not require a statement of the law applicable to the facts the court knows of no case that does. The report of this court in any case with the accompaniment of an opinion applying the law to the facts is the exercise of the right to make plain the court’s view of the law at discretion in all cases. Under those provisions which require-the publication of all opinions of the court in the volume of annual reports provided for by law the court has never before heard objections to making known its views of the law of the case whenever deemed necessary.
The claim is for the value of 124,000 acres of land in Mississippi which, it is alleged, had been located to 150 Chickasaw Indians under the fifth and sixth articles of a treaty between the United States and the Chickasaw Nation, dated May 24, 1834, known as the treaty of Washington, amenda-tory of a treaty of October 20, 1832, known as the treaty of Pontitock (7 Stats., 450; 382), and which it is further alleged, had been purchased by Eli Ayres and one Thomas N. Niles, but which the United States, subsequent to the alleged purchases had as to 141 sections, sold under article 11 as authorized by the treaty for the benefit of the nation, collectively, and which, as to 53 sections, had been located to other Chickasaws by the terms of the fifth and sixth articles of the amended agreement.
If the persons with whom Ayres bargained had no right to be located, they could transfer nothing which a court, either of law or equity, could enforce as a title. This is so, even though such persons had paper evidence of title, because it was not the certificate of location which conveyed the beneficial interest in the land, but the correctness of the action of those who by treaty were charged with its execution. The legal and equitable title of the persons conveying to *80 Ayres was dependent- upon their proper identification and location on the land by competent authority. So, if those Avho were to identify and locate, either fraudulently or mistakenly, located persons not entitled, the equitable beneficial interest to land thus located was in no such person.
The matter of Indian title is the root of the controversy, because if the persons from whom Ayres claims had no right to be located, Ayres, of course, acquired no interest, even if he paid value. In considering this initial matter we leave out of consideration for the present the matter of payment, the matter of location, and that last fatal provision which ojierated to make the conveyances to Ayres void as deeds and unenforceable as contracts. The matter now to be considered arises under the concrete statement set forth in the fifth finding, that:

The persons whose names appear as grantors of the lands described in the petition were not within the terms of the grant of the treaty.

Before the first of these treaties was executed the Chickasaws collectively lived on this land in Mississippi as temporary occupants, with only such right to remain on the soil as was accorded to tribes generally in the occupancy of land by the United States. Chickasaws were neither tenants in common nor joint tenants, but like other owners of communal property, where every member of the tribe, not as an individual but as a member and part of the community, held an equal, undistinguishable right of user, and nothing more. Nott, Ch. J., in Cherokee Nation v. United States (40 C. Cls. R., 325), emphasized the status of such persons by repeating from the previous decision of this court in Western Cherokees v. United States (27 C. Cls. R.., 1, 53) by saying: "The individual Gherohee had. no vested right which he could convey or devise or mahe the subject of a suit in partition. If he withdrew from the community, he left dll rights behind him; and if a stranger was admitted, he acquired a right by virtue of his admission alone.”
In Journeycake (155 U. S., 196, affirming this court), Mr. Justice Brewer declared that all adopted citizens of one of the civilized tribes must be regarded, in the administration *81 of their constitutional rights, civil, political, and personal, as citizens of the tribes of their adoption. Where removed individual Indians were absorbed, they were to be absorbed on equal terms in every respect with native citizens. The application of that rule to this case appears under another head.
Chickasaws living on the land as communal occupants only ceded this limited ownership in their treaty of 1832 to all the land then in their possession on the east side of the river to the United States. This treaty contemplated the removal of the Chickasaws to new homes, and by article 4 it was provided that should the Chickasaws fail to procure a country to remove to previous to the first public sale of the lands they were then to select a comfortable settlement for “ every .family in the Chickasaw Nation,” to be held and occupied until they should -find a country. United States guaranteed quiet possession and uninterrupted use of these lands so long as the Chickasaws “ might live on and occupy the same,” but the object still existed to rid the State of Mississippi of the Chickasaws and to provide homes for them elsewhere. As these homes were found and they were removed, their occupancy of lands in Mississippi was to cease, and these lands were to be sold by the United States for the benefit of the nation. (Supp., Oct. 22, 1832; 7 Stats., 388.) This treaty did not invest the individual Indian with a title, but the proceeds of the sales were to be for.the benefit of the collective Chickasaws.
The treaty of 1834 is the pathetic story of those Chickasaws who were “ about to abandon their homes ” and had to do so. The treaty discloses as parties on the one side occupants of the soil, but no others. The fee was provided for individual Chickasaws only who by the previous treaty had the right of occupancy by virtue of actual residence. Articles 5 and 6 designated the persons so entitled. By article 14 all the articles of the first treaty inconsistent with the last were revoked, except as to the twelfth and thirteenth. Thus the title to the residue of the lands after the selections and locations had been made under the agreement which conferred the fee to individuals remained in the United States, *82 to be sold by the Government and the proceeds devoted to the purposes named in the treaties. (Holden v. Joy, 17 Wall., 211.) This final treaty provided for the sale of all lands not located to individuals for the benefit of the Chickasaw Nation and the only exception to a sale of all the land was for the benefit of residents. Those individuals having residence qualifications by the terms of the first treaty apparently must have had the same kind of qualifications when the last treaty was executed before they could claim locations. If they were not there occupying the soil as Chickasaws, but incorporated with and obtaining tribal rights along with another and different tribe, they Avere not within the terms of the treaty which conferred the fee.
The second treaty with the Chickasaws gave the right of individual title generally, but before title could be vested in any occupant of the soil (these being the only parties to the new treaty) certain chiefs and commissioners Avere required to identify the residents so entitled, and locations-were required to identify each party claiming. Locations of those properly entitled Avere to be made with the assistance of the Indian agent. Heads of families, being Indians, or having Indian families, Avere provided for, but the reservations Avhich they were to take were expressly directed to be confined to the sections on which the party claiming might live or to such land as was contiguous or adjoining to the sections resided upon, subject to the restriction that in cases Avhere there Avere interferences arising the oldest occupant should have the preference; or, secondly, where the land was adjudged unfit for cultivation by the agent and three of the seven persons who Avere to make the locations the party entitled Avas to be located upon other lands which might be unappropriated. Reservations of a section each Avere provided to be granted to all persons not being heads of families of the age of 21 years and upivard, but the list within a reasonable time was required to be made out by the seven persons mentioned in the treaty and filed Avith the agent, upon whose certificate, of its believed accuracy the register should cause such reservations to be located upon lands fit for culti *83 vation, but not to interfere with the settlement rights of others. These official acts were necessary to give validity to the terms of the grant. It will thus be seen that with the provision that three commissioners only had the authority to locate fifth-article claimants residing on the land, but were without authority to designate any head of a family not living on the land as a reservee, any action taken to locate heads of families by three chiefs or a majority of the commissioners only could not accomplish the purpose of giving title to such reservee, because the treaty did not so provide. So, if the full body of commissioners authorized to locate persons not heads of families as sixth-article reservees did not act, there was no validity to attempted locations for single Indians. It is nowhere claimed for this claimant that lists were attempted to be made by all those whom the treaty designated to make the locations.
A provision in the treaty stipulating for the appointment of a new commissioner whenever a vacancy occurred on the board being expressly provided for, it was the intention to prevent action by a part of the identifying body. No quorum being provided for, no act of a minority of the board, or, for that matter, of a majority of the board, could" make the identifications complete. Accordingly, if an insufficient number undertook to supersede the terms of the treaty by locating land, their action did not confer rights of location. As an illustration of this rule: There are five judges on this court. But it took an act of Congress to declare three could perform official acts.
The persons who executed the treaty expressed the hope that all Chickasaws who were then about to abandon their homes would be able to find a country west of the Mississippi. By that clause of the agreement which provided for persons not heads of families a rule was declared that where the estate given by the sixth article came’ to children, the survivor of such children should be entitled to the same, but this rule was not to endure longer than five years, nor beyond the yeriod when the GhicJcasaws might leave. The whole scheme of this treaty was for the benefit of Chickasaw parties to it, and they could only be parties to it by living on the land *84 in affiliation, either by blood or marriage, with the tribe as of the time of its execution.
It was further provided that where any white man, before the date of the treaty, had married an Indian woman the reservation he might be entitled to if she were alive should be in her name and no right of alienation should pertain to the husband unless he first divested himself of the title after the mode and manner that feme coverts usually divest themselves of title to real estate. Rights to reservation secured by the agreement were declared to pertain to those theretofore intermarried with Chickasaws, but residents of the nation. The dominant idea appears specifically in the last clause of the seventh article, which gave treaty rights to intermarried Choctaws resident on the land, but excluded all Indians affiliated with Choctaws, and having Choctaw rights by their treaty, and living on Choctaw soil with Choctaw families.
There was a purpose to limit reservations to residents in the Chickasaw Nation. When the land passed under the treaty only signatories — parties in membership — were meant. The rule of participation embraced all persons whom it was the policy of the Government to remove. The agreement could not relate to airy who by alliance with another tribe had ceased to be entitled to land which if they ever occupied (occupancy is not shown) they had left. The Choctaw married to a Chickasaw living on the land and remaining there became entitled as a fifth-article reservee, because the treaty said so. The children of such union residing there when the agreement was entered into also became entitled to land as sixth-article reservees if single and of age. All Indians intermarried with the Chickasaws and having Indian families in occupancy were entitled to land, whether such Indians had a drop of Chickasaw blood in their veins or not. The white wife, when the treaty took effect, was entitled to land through her husband as a full-blood Chickasaw. The white husband of a Chickasaw wife became entitled. The children of such unions if single and of age were entitled under the sixth article. The children of white mothers and Indian fathers affiliated with the Chickasaws, *85 and living there, were reckoned as Chickasaws. The rule in force when the treaty was executed continued to be the rule ever afterwards.
On the other hand, if a Chickasaw intermarried with a Choctaw had gone west under the Choctaw treaty before the execution of the Chickasaw treaty and affiliated with the Choctaws as a Choctaw, he became entitled with the Choctaw tribe to such rights as the treaty with that tribe conferred, because that treaty provided for the tenure of land to the persons so occupying it as Choctaws and to their heirs forever.
These were matters of contract by which Ayres’s grantors must stand or fall. The purpose of the Choctaw treaty was to remove all of that tribe to western homes, which meant everything in the matter of a domicile; and by a change of. domicile such Indians lost their old domicile. If there was individual emigration by an Indian not of Choctaw blood but intermarried with a Choctaw, it was the case of an individual ceasing to be a member of the community such Indian left behind, no matter what tribe he abandoned, provided the Choctaw tribe permitted the incorporation by marriage and agreement for residence among them. Children born to such unions were as much Choctaws by established usage among the two tribes as Choctaw children of full blood. In law the findings established the Ayres grantors to be Choctaws. They could not be both Choctaws and Chickasaws.
Aside from the want of proof that the persons under whom, Ayres claims title were of actual Ghichasaw Mood or the extent of it, the contention that Chickasaws affiliated with Choctaws before this treaty were yet parties to the treaty can not be accepted as sound without running counter to every rule declared on the subject, not only by commissions engaged in the work of enrolling proper parties among the Five Civilized Tribes, but also by the courts, including the Supreme Court. Possession of blood alone is not sufficient to entitle an applicant to participation in the distribution of tribal property, either of the Choctaw tribe or the Chickasaw tribe, under the treaty of 1837 between the two tribes.
*86 This identical proposition was established in a great case years ago, where very large sums were disbursed and where the court excluded individual emigrants. It said that in determining who were the persons within the intent of a treaty the court must resort to the actual communities existing at the date of the execution of the treaty, so far as the communities could be ascertained, and must carry out the intent without the limitations imposed by Indian, rules or customs which would defeat the chief purpose of its execution. (New York Indians v. United States, 40 C. Cls. R., 448.)
The possession of blood, is always essential, but the blood established a second inquiry necessarily follows — that is, whether an applicant belongs to any one of these classes of Choctaws or Chickasaws entitled to share in their property under the Choctaw treaty of 1837. In the Choctaw Nation there are but two classes entitled to share in Choctaw property: (1) Those who were parties to the Choctaw treaty of 1830 and who removed west and who with their descendants have continuously lived there in accordance with the agreement contained in the third article of that treaty, and (2) those persons who remained in Mississippi and complied with the requirements of the thirteenth article of the same treaty. Though an applicant might show possession of Choctaw blood, yet if he failed to show that he or his ancestors belonged to one or the other of these classes his application to membership has been continuously denied. As to the Chickasaws, there is only one class of claimants by blood entitled to enrollment, which class comprises those persons only who were parties to, and who complied with, the requirements of the Chickasaw treaty of 1837 and who removed upon the lands of the Choctaws in pursuance of that treaty, and who and whose descendants have continuously resided there.
There is a final view to take of this whole matter of great significance. If there is one fact better proved than any other fact in this case, it is that the persons who undertook to convey land to Ayres treated themselves as Choctaws; that not one of them personally ever claimed to have lived on the land; not one of them was on the land when the *87 treaty which provided for reservations was executed. There was no incentive, if they did live on the land, for them to leave it before reservations were assigned.
The sixth ultimate finding shows that “None of the persons from whom Ayres and Niles attempted to purchase land set forth in the instruments of writing purporting to corvoey were duly enrolled, and the lands described in the petition were not legally reserved and located for or to them pursuant to the provisions of the treaties governing the disposition of Chickasaw lands in Mississippi, and no title was ever acquired by them to the lands which Ayres xmdertoo/c to 'purchase."
This finding discloses the attempt to locate people living with the Choctaws in the Indian Térritory and the means employed to give them land in Mississippi and the failure to do so. The requirements for certificates to carry out the treaty and to prevent frauds were disregarded. The papers on file affirmatively show that the requirements of the treaty, as -well as certain departmental regulations to insure identification, were not complied with. This is true as to the alleged enrollment of both fifth and sixth article reservees.
Claimant admits that the commissioners provided by article 4 of the treaty to locate sixth-article reservees did not act. He also admits that for fifth-article reservees (heads of families) only a part of the chiefs undertook to act, and the admission includes the fact that the effort of only some of the body of commissioners to locate fifth-article reservees could only act for those who had residence qualifications. As to persons claiming reservations under both articles, it is admitted that they were not only nonresidents of Mississippi when the treaty which gave the land was executed, but that they were living among and affiliated with the Choctaws west of the Mississippi. (There have been other counsel in this matter than those now in charge, whose admissions we quote.) But whether admitted or not, the finding is uncontradicted that the people attempted to b'e enrolled had no pretense of residence or occupancy on the land in Missisippi. Heads of families had to live on the land if properly located under the fifth article. Three of *88 the seven commissioners were authorized to act only upon residence qualifications. Persons not heads of families could only be located by a list made within a reasonable time after May 24, 1834, by seven «persons provided to locate sixth-article reservees having a residence on the land ‘at the time of the treaty, upon the condition, of course, that such single persons had qualifications by enough affiliation as a Chickasaw to make such person a party to the agreement.
Six lists bearing the names of the Ayres grantors contain no certificate of anyone, either commissioner or agent. The lists are on different paper in kind and size from persons lawfulfy listed and contain no information as to residence. Two out of the four sheets bear the signature of the Indian agent, with no comment. There is nothing in the first list transmitted to indicate to whom it was addressed or to whom sent; no age or sex indicated, except in one name; no location proposed, except for one name; no residence or roll number shown in any case; the signatures are not witnessed and no witness appears to identify the cross-mark signature of Ish-to-ho-to-pa; there is nothing on the list to shoiv that it was ever received by any Indian agent and it affirmatively appears that it was not made with the assistance, cooperation, or knowledge of any Indian agent. On the lists subsequently transmitted certain names appear assigned to double-roll locations under the fifth article. Other lists embracing 68 Indian names show a request of four commissioners for enrollment, but the lists show affirmatively that no Indian agent ever took any part in making up the lists as required by the treaty and those whose names appear as signing the lists never made any attempt to make locations or to select reservations or to give the required information as to residence or former occupancy. These lists are in every case witnessed by the paid agents of Eli Ayres or by others interested in the purchase of lands from Indians in the West. With these lists as a basis the incomplete papers were sent to the land office. The first agent, on October 22,1838, transmitted four sheets, together with all the testimony relating to the propriety of locating them. This agent thought that it was his duty to admit them to be enrolled and located, but *89 also stated that in making out the lists they neglected to give the district to which the parties belonged, as well as the ages of those under the sixth article, and that he was unable to correct the omission. Then this agent expressly stated that he could not attach the usual certificates to the rolls, hut was satisfied that many of the Chickasaws emigrated with the earliest Choctaw emigrants. This shows that the persons attempted to be enrolled were parties to neither the treaty of 1832 nor the treaty of 1834. No proof was subsequently offered that any of the persons whose names appear on these lists were Chickasaws at all.
As to all the names appearing on the rolls transmitted by the first Indian agent it appears that the locations were not made either according to the requirements of the treaty or the regulations. It does not appear that the first agent transferred to the second agent any other authority, certificate, or proof than the letters and lists sent to him from the four - Chickasaw chiefs and the Choctaws who were aiding them in procuring locations.
Subsequently, the second agent transmitted for examination, and also for examination of the President, other lists of what he said was a roll of Chickasaw Indians who had emigrated west. This was May 4, 1839, from Memphis, Tenn. He stated that the paper was signed by all the commissioners who were in the 1Vest, and that he, the agent, presumed that they had examined the claims strictly and were satisfied with their justness. The agent also transmitted proofs from the Choctaws. Prompt action was requested so as to enable the agent to go west. This agent sent no certificate and the papers contain no certificate of believed accuracy, as required by the sixth article of the treaty, and nothing of the kind exists.
The action of the agents Avas not an approval of the lists. Both properly postponed the exercise of the power conferred upon them by the treaties until the matter could be investigated. Neither agent was present with those of the commissioners who assumed to act for all, but were hundreds of miles distant and kneAV nothing except what the papers disclosed. The lists had no validity for the two reasons appearing on the face of the papers.
*90 Rumors of fraud in connection with these, lists reached the seat of government, where the lists were sent for examination, supplemental to the information on file in the land office, that fraud was being perpetrated with respect to the efforts to obtain land under the treaty. Soon after that two •attorneys, professing to represent a number of Indians claiming to be entitled to land, addressed an argument to Hon. John Bell, then Secretary of War, in which it was argued that the letter of the first Indian agent was a virtual, if not a literal, compliance with the requirements of the treaty. There was no pretense, however, in this argument for any of the lists mentioned that the seven persons required to act had taken action.
Upon the recommendation of the Commissioner of Indian Affairs, the Secretary of War ordered an investigation, and thereupon transmitted the lists and accompanying papers to the acting superintendent of Indian affairs for the western country, with directions to refer the matters involved to the commissioners provided for in Article IY of the treaty of 1834. The persons who were thus given power to investigate, so as to enable an agent to certify to the necessary accuracy, constituted the same body which by the treaty was required to make up the lists.
The superintendent went west among the Chickasaws and Choctaws and for eighteen months investigated. A council of the Indians was called, and all of the commissioners duly authorized to act under the fourth article of the treaty, including Ish-to-ho-to-pa, the king, were present except one. The agent appointed to make the investigation provided for a meeting immediately after the annuities for the year 1841 should be paid the Choctaws and stated that this was considered a proper time to give notice to all concerned. It is now said that Ayres was in Mississippi at this time, but one Dol-larhicle, who was his active agent and who wrote the letter showing small cash payments, was undoubtedly present, because he had full notice that the claims of the persons from whom Ayres said he purchased would be investigated, since he said he was there for several years in a store on the line. This private representative of the claimant being in the Chickasaw country had full information, and the record *91 affirmatively shows that the claimants of land had full notice of the Chickasaw council and through their attorneys knew that the matters involved would be considered at that council. Besides sis commissioners provided by the fourth article of the treaty, the council was attended by twenty other chiefs and headmen of the tribe. Sixteen of the participants were signers as chiefs of the treaty of 1832 and familiar with the business of the Chickasaws.. The findings show that the council was large and was attended by the oldest and most respectable of the Chickasaws and that the claims were examined. Government had notice that there was no disposition on the part of the Chickasaw commissioners to overlook claims of such, if any there were, entitled to land. The findings show full particulars of the means employed to prove or disprove the correctness of the lists.
The original lists were declared to be erroneous except as to four Indians, and the action of the council was adopted by the king of the Chickasaws and five other commissioners provided for by Article IV of the treaty and by leading members of the tribe which included the sixteen chiefs of the Chickasaws. Thereupon, the superintendent charged with the investigation officially submitted the results, and -these reports received the approval of the President. This excluded about 500 persons not shown to be Chickasaws, including in this number the Ayres grantors.
It is urged that the council was attended by one less than the full board of commissioners; and for want of notice to purchasers of the land was irregular. The action' of the council, however, was as formal and regular as the original acts. Not more than four commissioners for any part of the land professed at the outset to have any knowledge of the identity of the persons, and the official action of this number ivas restricted merely to a request that certain persons be located. The council of revision >vas participated in by the Chickasaw king — the same Ish-to-ho-to-pah who had lent himself to the attempts to get up the lists — and by a representative body of commissioners and chiefs — enough to make their action more valuable as proof of who Avere entitled to locations than the sinall number who originally desired to locate the 524 Avestern people. So this last body was irregu *92 lar only in that it was attended by one less than the seven jjrovided by law to act in identifying the proper Indians. The council was not irregular in the sense that the commissioners did not have the right to meet and investigate with or without notice to any attempted purchasers of the land. At that time — and for that matter at any other time before or since' — no right of alienation existed and notice to Ayres was not necessary. He was not only not entitled to notice because his contracts were void, but also because his grantors had nothing to sell for want of previous identification as Chickasaws. They had neither been ■ located according to regulation nor treaty; and not a man among them had any evidence of location. Ayres had been .informed by the Thompson letter that all action relating to the claims for land of the people from whom he was trying to purchase would be suspended until a census could be taken. Ayres was suppressing his interest in the land or concern for anybody but the grantors themselves. They had notice; that was enough.
The finding as to notice is based upon direct proof and the absence of denial and counterproof.
The value of the Boggy Depot council as testimony in that state of affairs, caused by the Indian agent withholding a necessary act under the treaty and asking for instructions, can not be denied, because it aided the Indian Office in determining the status of the alleged reserves and, as proof of a matter then uncertain, the proceedings among the representatives of the Chickasaw tribe are valuable as testimony. The jurisdictional act makes the action of this council competent as testimony, and as there was nothing to contradict its findings the court has given credit to it.
The matters relating to rights of location rested pending efforts of the commissioners to complete their work by finding and identifying every Chickasaw entitled. As many as 53 sections were located to that number of Indians properly identified. (No question now appears as to the proper identification of these 53 persons.) Thereupon, the United States as trustee sold at public vendue 141 sections under that provision of the treaty which carried the proceeds to the credit of the Chickasaw Nation. (Art. XI.) Patents *93 were issued and the purchasers went into possession. The land was properly sold, unless the persons attempted to be located had possession or color of title. They had neither. No certificate of location had issued. No authenticated papers existed showing locations. The Secretary had no knowledge of the action of the register and could not have had, because it is certain that the register himself had taken no action in locating. If he did take any steps such action was secret and the locations were made not only without the agent’s certificates of correctness for fifth article reservees and believed accuracy for sixth-article reservees (without which the register was not authorized to act), but also without anything to indicate that the requisite number of chiefs and commissioners had acted at all by supplying proper lists. While it is true that if these alleged reservees had secured the entry of their names upon a roll and the agent had after-. wards neglected his duty by failing to annex a proper certificate to the roll before he returned it to the register’s office, an Indian could not be. prejudiced, at the same time it was essential to a valid enrollment for the papers given to the register to have been made up by the full original locating authority. This Avas not done. The mere entry of names of locators on a blank sheet of paper Avith nothing to shoAV that the commissioners had acted did not authorize the register to act, because he could not do so on a list not duly authenticated. Otherwise, we would have the spectacle of the agent. taking the Avhole matter in his hands and, by handing in names not on these lists Avith the sanction of the body designated by the treaty to act, such agent would have superseded the terms of the treaty. The best evidence exists for believing that the register and all persons concerned knew that locations Avere not proper, not only because the field agents had given no certificates of accuracy (and never have), but because the papers themselves in the hands of the register supplied evidence that none of these people lived on the land, and the inchoate attempts of part of the commissioners that requested locations were insufficient. An examination of the papers not only discloses this, but no proceedings were attempted to be taken by a single man of them to set aside *94 the public sale of the land soon after that, or to prevent the subsequent sales. None of the persons negotiating for the purchase of the land intervened to suspend action, and no attempts were made to take possession of land except as to two small tracts. . This, to the mind of the court, conclusively establishes the proposition that there was something wrong in connection with the attempts to locate, and that some of the officials knew it. The Secretary of War, who then had jurisdiction to execute the treaty so far as he could exercise his authority, had the right to order an investigation into all matters pertaining to the lists, independent of any departmental regulations, because locations were only in process of ascertainment when he undertook to act, and it is difficult to see why the department should not investigate that about which agents had their doubts, as it affirmatively appeared that the commissioners as well as the agents had not undertaken to exercise their powers, and there was no pretense of the register having acted upon insufficient lists. If the department had no authority, to investigate a matter not closed by the certificate of the agent, when requested by that agent to pass upon the information submitted to him concerning proposed locations, the department certainly had authority to investigate when, by every paper in existence, it appeared that the power delegated to the commissioners had not been exercised.
When the Secretary of War in 1843 rendered his decision in the matter of the 524 claimants, it'included the 150 in issue here. ' He concurred in the report of the investigating superintendent and formally approved it by the allowance of those claims to reservations recommended and.the dis-allowance of those that the superintendent, six commissioners under the treaty, and sixteen chiefs of the nation had rejected. The Secretary also said that the rejected claims could not be allowed because the utmost liberality of construction could not extend the terms of the treaty of 1834 if the list embraced any Chickasaws who emigrated prior to that treaty. That was a departmental rule of construction acquiesced in at the time by people who had no certificate of location and who, as a matter of fact, had not been located. It was a construction resting with the political department *95 of the Government. The grant of the treaty was in prce-senti to the Indians who were parties to it, but title did not attach to anyone until location by the proper authority. When the Secretary took action he annulled nothing.
Whether under the rules and regulations then in force the Secretary possessed the authority to pass upon the matter is not necessary now to discuss, because the action of the required number of the commissioners and the necessary agent’s certificate were both wanting. The construction of the Secretary of the terms of the treaty was contemporaneous construction, which in the then state of affairs was proper to be made and must be acceped as final unless clearly shown to be erroneous. “ It is a settled doctrine ” -of the Supreme Court “ that in case of ambiguity the judicial department leans in favor of a construction given to a statute by the department charged with its execution.” (U. S. v. Ala. R. R. Co., 142 U. S., 621.) If the departmental construction were obviously wrong it would be the duty of the courts to so adjudge; but if there seemed to be doubt as to the soundness of the construction, the action of the Government should be respected and should not be overruled, except for cogent reasons. (United States v. Finnell, 185 U. S., 236.)
The, departmental construction is not obviously wrong, but right on the facts. Time has proven its correctness because no effort has ever been made with any administration to show that any of these reservees ever lived on the land or that they had enough Chickasaw blood in their veins to warrant any holding that they were parties to the treaty.
There would now be nothing left to consider in the matter of location and right of location but for the action of the register which caused certain- proceedings to be instituted in the courts. On March 18, 1846, the register issued a certificate showing a reservation under article 6 of the° Chickasaw treaty to one Ho-yo-po-nubby. Thereupon ejectment was instituted in the matter of John Doe, ex dem. Ho-yo-po-nubby v. Wray, 10 Sm. & Mar., 452. This case was followed by Hardin v. Ho-yo-po-nubby's Lessee (5 Cush., 567). (The latter case is merely an affirmance of the former decision.) The patent to the land had then been issued and the right of property vested in the patentees. The Land De *96 partment had made its findings on the facts upon which the land had been sold as provided in article 11 of the treaty, and under the rule that in the absence of fraud or imposition the findings of the Land Department on matters of fact became conclusive. Nothing was then open to inquiry but matters of law involved in the issuance of the patent. (Love v. Flahive, 205 U. S., 195.) It has been nowhere said that in issuing these patents any officer of the Government did a fraudulent thing.
It was held on the same facts in both cases in the trial of the ejectment proceeding that the certificate of the register showing that land was reserved under the sixth article raised a presumption that the preliminary steps required by the treaty had been taken. No further evidence was offered and no defense made beyond an objection that the certificate was not competent evidence. If the defendant, however, had been in possession of the facts appearing in our findings and offered these facts in evidence, the presumption of the certificate would have been overcome. But none of the facts which the record here shows relative to the illegal and unauthorized attempts to enroll two Indian plaintiffs, and none of the facts relative to the subsequent action taken by the Government and by the chiefs and commissioners charged with the duty of investigating the alleged fraudulent attempts to obtain enrollment for those people was made known to the court'. The two cases, decided entirely upon the formal certificate of the register, were based wholly upon the presumption implied by the certificate. Mr. Justice Clayton, in the foundation case, stated that the reservation certified to by the register was secured before the date of the ¡latent, and had the preference over it if the location of the land was property] made. The certificate could not have been given the preference over the patent if the certificate was fraudulent or the result of mistake. The certificate would have been unavailable had the court been put in possession of the proof showing that no location, according to the directions of the treaty, had been made at all. The cases were followed in Best v. Polk (18 Wall., 112), which was likewise governed by the presumption of regularity raised by the register’s statement, because the local decisions furnished a rule of property in *97 Mississippi. Best v. Polk was also an action at law, the only difference between it and the other cases being that Brown, who held the patent, had conveyed to Polk, who found Best in possession of the land, and sued in ejectment to oust Best. The only proof before the court was the patent and the certificate of the register. As this certificate showed that the reserve of the Indian was located on the disputed section, the assumption was that the directions of the treaty had been observed. The grant in itself raised the presumption that the incipient steps required to give it validity had been taken. But the court said that if the location were not as stated in the certificate, it was easy to show that fact, and that “ if the location of the land in controversy was properly made, the legal title toas consummated and the subsequent patent was unauthorized.” This statement furnishes the key to the whole situation, and an inquiry as to the consummation of the legal title was necessary tiefore the court could do anything else but give, effect to the presumption raised by the certificate. Want of proof relative to the alleged enrollments and the right to be enrolled necessarily left the court the simple duty of applying the presumption that the inferior officer who undertook to make evidence for these people had done his duty on the necessary identifications.
All the cases were properly decided, and there is no conflict between what they decided and what this court now decides. With nothing before us but the > register’s certificate there would not only be no difficidty in arriving at the conclusions of the reported cases, but there could be no question of our duty so to do because of the obligation to follow the decision of the Supreme Court. But the accuracy of the register’s certificate is not only questioned but successfully impeached. It rests upon lists not made by those who in the first instance had authority to act. These lists went no further than to embrace names never assented to by the requisite number of chiefs. They were inade-, quate to confer the beneficial interest even if the requisite number had joined in their preparation, because the findings show that none of the persons listed were residents on the land or parties to the treaty, but on the contrary were neither entitled by affiliation or blood to claim a Chickasaw right *98 of any kind at any time. The certificate was issued without the agent’s certificate of accuracy. This finding of itself sustains the proposition that not a section of the land was located to Ayres’s grantors according to the requirements of the treaty. The absence to this day of the certificate from the agent to the register establishes the incorrectness of the register’s action, if he took any (and there is no proof that he did), and likewise establishes that the register substituted himself in place of the field agent to provide the missing certificate of accuracy from agents charged with that duty. The treaty did not require the list to be filed with the agent before the location could be made, but it did require that a list of the locators within a reasonable time should be made by the seven persons provided by the treaty and filed by the agent at some time. The certificate of correctness was indispensable before the register could properly act and before he could projierly issue the consequent certificate of location. The attempt to locate rested by the terms of the treaty upon something which the register had no authority to supply. This want of authority to issue any certificate of location applies with equal force— and likewise sustains the proposition that locations were not made according to the requirements of the treaty — to the absence of any affirmative action on the part of the necessary number of chiefs.
With proper lists in hand showing enrollments by the necessary number of Indian officers authorized to identify the persons whose names appeared thereon, such persons could not be prejudiced if the agent failed to annex the proper certificate before he returned it to the register’s office. Wray v. Doe, supra, so stated, but was followed by the explanation in Hardin v. Ho-yo-po-nubby’s Lessee, supra, that the location certified to by the register was evidence (only) that all the prerequisites were complied with and that a violation of duty on the part of the officer who made the location was not to be presumed. Of course not. With such certificate in hand the presumption was that the condition on which the officers were authorized to act had been observed. Without such a presumption a burden not contemplated by the treaty on those who had obtained such evidence would be imposed.
*99 But the location had to be fixed before the grant could become operative in favor of an individual Chickasaw. The estate could not become vested until there was proper identification by the proper' officers. The essentials affirmatively appear to be wanting in everything underlying the register’s certificate. As the certificate given by the register does not show any evidence of official action by the register other than that contained in the statement that the papers certified by him were a correct copy of the list furnished by the agent, we must look to the originals on file in the Indian Office; and in comparing these originals with the alleged copy it is manifest that the essentials upon which only the register could act were wanting.
There was nothing sacred in the certificate nor did its issuance malee it true. If given as the result of an erroneous conception of duty, it was open to explanation, and if it was a fraud, then, upon the familiar principle that fraud vitiates everything, it was subject to impeachment. The jurisdiction of equity courts was not necessary to show the incorrectness of certificates issued either through fraud or mistake. Matters of defense going to the correctness of the register’s action were proper in ejectment proceedings at law without resort, to courts of equity to uncover all defenses, which under this jurisdictional act we have been obliged to investigate. It has already appeared that the alleged reservees were not Chickasaws entitled to land; that none of them ever established their right to claim as residents of the soil or as parties to the treaty at the date of the execution of either agreement ; that never at any time did they establish affiliation of any kind with people for whom reservations were provided or for whom annuities were ever given in dealing with the United States. Either one of the defenses recited is sufficient in itself to sustain the proposition that the persons from whom Ayres claims title had no title themselves.
The fifth article of the treaty providing for heads of families did not authorize the register to locate the head of any family, except in the contingency of residence as Chickasaws. This article only provided for heads of families on land upon which the party claiming lived at the time, or to such land as was contiguous or adjoining to the sections resided upon.
*100 This brings us to the matter of the regulations. On the first argument is was urged that the regulations were void. Curiously enough it is now contended that since article 5 did not provide specifically for the form and manner of making lists nor for the particular persons to certify to the same, that matter was left to be controlled by executive regulation, and that reservations and locations under the fifth article did not require list and certification under the treaty. The answer to this is that the reservees under the fifth article were to be listed as provided by the fourteenth article of the treaty of 1832, which provided that these lists showing locations should be made by the chiefs of the tribe with the advice and consent of the agent. The lists purporting to have been transmitted by some of the Chickasaw chiefs were certified by Ghoctaw chiefs, and among those Chickasaw chiefs who made the subsequent investigations there were included some of the Chickasaw chiefs who charged and reported to the Government that the lists were' wrongfully made. Moreover, these lists never attempted to show any locations or roll numbers. Furthermore, if the treaty-contracting powers intended that these important matters rested with the Executive, then it is certain none of these claimants had complied with the regulations. If the regulations affected the matter, then the subsequent rejection of the reservations for the fifth-article people was proper, because the same authority that could make regulations could decide what was valid under them.
The court did not deem it material at the outset to decide anything respecting the validity of the regulations, nor is it necessary now (as the findings show that the locations were not made according to the treaty), beyond saying that where the regulations and the treaty conflict the terms of the treaty govern. This view is in line with the opinion of the high court of errors and appeals of Mississippi, but it is also proper to say that the regulations had meaning where not contradicted by the directions of the treaty. Under the act of July 9, 1832 (4 Stats., 564), which was then in force, it was provided that the direction and management of all Indian affairs and all matters arising out of Indian relations under the authority of the Secretary of War “ should be agreeably to *101 such regulations as the President might from time to time prescribe; ” and under a similar statute in the matter of citizenship (which is one of the vital things in issue here) Mr. Justice Holmes in a very recent case said that the primary decision must come from the official exercising supervision and that the court of last resort would “hesitate a good deal before saying that this language was not broad enough to warrant a regulation obviously made for the welfare of the rather helpless people concerned.” (U. S. ex rel. West v. Hitchcock, 205 U. S., 564.) Besides the general power under the statutes to prevent improper locations the United States as trustee had to properly execute the trust. Regulations directing the exercise of enough supervision to prevent fraud or mistake throughout were necessary upon the Government under the regulations and independently of them. •
It is due the committees reporting on this claim to say that being without the facilities of a trial court and without possession of all the proofs there is no detailed statement of those essentials relating to the status of the alleged reservees and their right to claim land; no allusion to the insufficient methods employed to locate them as Chickasaws, and no showing made of the incorrectness of the register’s certificate which, in the making of - a prima facie showing of title in the alleged reservees, led to decisions which might have been averted by proof. These omissions are not to be wondered at, as the action of the courts created such alarm respecting the title to so much land that the President recommended that steps be taken to determine these titles. These steps were either never begun, or if taken were abandoned, because opportunity was never given the Government nor afforded the patentees to test the validity of adverse claims to the land, although the courts were open to declare title vested in every Indian on the register’s certificate, if such certificate had again been offered as the basis of a claim. This is highly significant. It refutes the contention that the belated certificate of the register had value. It is also significant that when Ayres concluded to avoid the courts and to invoke aid from the political department of the Government there were adverse reports to him on that line. *102 January 11, 1884, unanimous consent was obtained in the Senate for leave to bring in a bill introduced by request by a member of that body from Mississippi “ to quiet certain land titles in Mississippi,” with a preamble showing that Ayres was willing to accept in lieu of the lands a very large sum of money, stated in the bill, in full satisfaction. This bill was considered by the Committee on Private Land Claims, composed of some of the great lawyers of the Senate (Bayard, of Delaware; Edmunds, of Vermont; Manderson, of Nebraska; Jonas, of Louisiana; and Colquitt, of Georgia) , who reported, that the parties claiming had failed to comply with the provisions of the treaty and that the committee had “ no hesitation in deciding that for want of the performance of the conditions so plainly made necessary by the treaty there was no duty incumbent upon Congress to fortify the defective titles of the claimants.” -The report was accompanied by a recommendation for the indefinite postponement of the bill, which was done and accepted by Senator George, who had previously introduced the bill by request. Subsequently, other bills were introduced for the. relief of Ayres upon the theory that he was in equity entitled to amounts variously stated, and on one of these measures an ajDpropriation for $58,158.46 passed the Senate, which the House rejected. This action subsequently led to the passage of the jurisdictional act.
These reports rest upon the erroneous recitals of a Commissioner of Indian Affairs made as late as 1882 upon an examination that could not have been based upon all the evidence before this court. This initial report- ignores the status of the persons alleged to have been located as nonresident aliens; assumes that locations were made according to the treaty in the face of the fact affirmatively shown that the treaty was not complied with. The report speaks of the Indian title as having been affirmed by the courts while admitting that in the cases so affirmed the identity as Indians of the two named in the decided eases was not questioned. The report wrongly assumes locations to have been proper upon the mere request of three commissioners whose action in that regard was restricted by the treaty to the location of those -only living on the land (at some time certainly), which was *103 not the case, as the overwhelming preponderance of the evidence establishes that none of them ever lived on the land at all even as communal occupants and that not one of the alleged locators ever claimed in anjr court or before any department of the Government or before am*- Indian agent or before any authority that he ever lived upon it. The report assumes that Ayres was an innocent purchaser, that he paid his money, and says “ that various reports and decisions upon this matter seem to admit the equity of the claim.” In all this the commissioner was mistaken.
Aj'res was not an innocent purchaser; these so-calléd re-servees were never identified; they were not in possession of a single tract for want of identification, nor had any certificate of the right to possession been issued when the alleged purchases are said to have been made. The instruments of writing under which the claim is made were void and not entitled to be recorded by the law of the State where the land was situate.
As to the payments, a finding would be immaterial except for the special act, as the question naturally arises, What would the Government pay for if Ayres had no title? The court at the outset found that some nominal payments were made, because the payment of something was probably necessary to procure the signature of the Indians from whom the purchases were attempted, but that the amount of the payments was not established.
Upon a careful review the court is strengthened in the correctness of the finding that the payments were small and nominal. The evidence also establishes that substantial payments were not 'made pending the doubts respecting the right of the grantors to acquire the land.
The court is not unmindful that as to 21 of the conveyances an Indian agent certified to full payments generally. But that agent is contradicted by another agent on the spot making special examination; by another witness, who was the agent of Ayres, and that agent, though making his statement in the form of an unsworn letter, contradicting his own affidavit in the same manner. Six of the Indian -officials connected with this treaty also contradicted the statement that payments were made, and there is much proof and many cir *104 cumstances in the record to show that all payments were exceedingly nominal and unsubstantial. The agent who gave a certificate as to 21 claimants out of 150 acted upon belief and not upon personal knowledge, because the time intervening from the date of the instruments proves that he knew nothing except upon information acquired the next year-after the instruments of writing were given. The treaty contemplated that the agent should certify to matters within his knowledge and not to information derived from interested sources. No matter what the belief of this agent, the great preponderance of testimony overwhelms his statement.
The findings show that white persons were giving antedated bills of sale to Indians on account of the purchase of lands. Hosts of speculators were hiring half-breeds to interpret for them, and deeds to land were being signed, some of them in blank, upon the payment of $5 to $10 in advance. This is so as regards those Indians about -whom no question existed as to their being properly located. Private memorials exhibited to the Government disclosed frauds on the part of land speculators, and numbers of these were passing into the country of the Choctaws in search of Chickasaws and their descendants. There was continued protest from officials and from the Chickasaw tribe against the methods employed to obtain lands. Ayres and Niles lived in Mississippi, and they and their agents were active in trading with red men wherever found. The language of a council which considered this matter was that the beneficiary “ never had, never will, or never intended to pay the pretended owner one cent.” The language refers specifically to these instruments. It is argued against one prominent witness that he was interested in having his constituents buy land at a nominal price, while Ayres was paying full value. This argument refutes itself. If the land would have sold for a few cents an acre at public sale, why should Ayres have been willing to give more at private sale ?
The proving power of circumstances alone is great enough to overthrow the presumptions arising from the recitals of instruments «which the alleged purchasers must have known were void as deeds and unenforcible as contracts when they were given. Proof of payment of something substantial to *105 show divestiture of the supposed Indian interest was never offered to obtain approval; such proof would at least have been suggested to show good faith and secure relief of some kind when witnesses were living. Not only was it not offered, but, with nothing to prevent Ayres from procuring letters of attorney from the alleged reservees, or taking leases from some of them, at all events, and instituting eject-ments or possessory actions for the land, the alleged purchasers were silent. The local courts were open to give effect to the certificates similar to the two given in 1846; and as Ayres had possession of such certificates like those used in the two reported cases for years before the Indian right of entry (if suph right existed) had expired, we must assume that for want of sufficient interest in the land Ayres failed to prosecute.
There is a final view corroborative of the belief that the payments were nominal. Appeals were made to the Government to hasten the investigation upon the ground that the alleged reservees were in need of money. Why should such an argument have been .used if Ayres and Niles had paid for the land?
Regardless of Indian rights of location, Ayres never acquired a title of any kind. That he had no legal title is admitted. Nor did he have an equitable title.
The treaty prohibited conveyances except upon conditions never complied with. The restrictions thrown around the transaction (for reasons which can not be questioned by lapse of time) have not removed the difficulty, but, rather, have added to it. That an equitable title can not be carved out of the instruments of writing shown here to be void as deeds was decided under this treaty in Mississippi. It was held by its high court that the supreme power had the right to prescribe the conditions to be observed in alienating and that it might as well be contended that any citizen could dispose of his realty regardless of all statute provisions as to ask the courts to remove the restrictions upon this right of alienation, in the Indian. (Harmon v. Partier, 12 Sm. & Mar., 427.) The Supreme Court of the United States has given effect’ to similar restrictions not merely because of treaty supremacy over any claim of equitable right, but pursuant to *106 public policy involved in protecting the ignorant and the weak against the cunning and the strong. Presidential right of approval conferred by treaty has not been- interfered with. (Pickering v. Lomax, 145 U. S., 310; Lomax v. Pickering, 173 ib., 26; Lykins v. McGrath, 184 U. S., 173.)
By the rule summarized from the equity jurisprudence of both the English and American systems by that great judge who delivered the opinion in one of these cases, the court finds that an equitable title was not acquired by Ayres. “An equitable title,” said Chief Justice Sharkey, “ is a right imperfect at law, but which may be perfected by the aid of a court of chancery, either by compelling parties to do that which in good faith they are bound to do, or by removing obstacles interposed in bad faith to the prejudice of another.” (Niles v. Anderson, 5 How., Miss.) Under this rule equity could have done nothing for Ayres. If it could, he had the right under an act approved February 5, 1841 (Miss. Code, 1848, 773), if a rightful owner of land in the State, to have conveyances forming a cloud on his own title canceled, whether as a real owner he were in .possession of the land or not. Whether this statute enlarging the jurisdiction for these purposes of quia timet bills could have been applied, as the patents were not the common source of title, is unnecessary to inquire. Before the invalidity of the patents could have been shown in equity there must have been a perfect legal or a perfect equitable outstanding title. (Toulmin v. Heidelberg, 32 Mississippi, 268.) There was ample time for judicial investigation, because the statute of limitations had not barred whatever right existed in the supposed muniments of title.
There is nothing in Niles v. Anderson, supra, to sustain the contention for an equitable title. That case merely enjoined a purchaser from prosecuting a possessory action for land who had obtained a conveyance from a lawfully located Indian, which conveyance Anderson charged had been taken in blank before location of the reservation with knowledge on the part of one Niles that the person asking the injunction had a conveyance to the same land but did not have attached to his conveyance the necessary certificate of the capacity of the Indian to convey. Niles being in possession of the *107 certificate, it was charged against him and admitted on demurrer, that, the certificate was secured by misrepresentation by means of substituting one Indian for another. Chancery removed the impediment in the way of the rightful purchaser with the statement that in such a fraud impediments improperly imposed could be removed in a court of equity.
There would be force in the contention that the instruments of writing could not be approved as conveyances until there were sales but for the obligation of the treaty which imposed upon the President the power to examine the matter and Avithhold approval. That provision was intended not alone for the benefit of individuals properly located, but likewise designed to afford protection to the whole tribe against fraud. Purchasers took the risk in bargaining for land of having the conveyances made valid. And when in 1850 the two conveyances actually presented were not approved, Government had knowledge that there was a want of right of location, want of proper identification of the parties as Chickasaws, alleged and proven want of good faith in the matter of the purchases, and that if any payments at all had been made by Ayres such payments were made upon the pretense of location without such location as the treaty required.
A new treaty resulted between the United States and the Chickasaws in 1852, and authority was given to the Chickasaw legislature to determine the claims of all persons who were entitled to land in Mississippi as well as the claims of all persons to membership in the Chickasaw tribe for annuities. (-, Stats.) Whether rights of property could be taken away by subsequent act was not considered or decided by the Supreme Court in Roff v. Burney (168 U. S., 218), but it was there held that the validity of an act withdrawing citizenship and the rights of citizenship in the Chickasaw Nation when determined by the authorities of that nation was not subject to correction by direct appeal from the judgment of the Chickasaw courts and that personal rights founded on the mere status created, by a prior act fell when the status of citizenship was destroyed. The action of the legislature of the nation in declaring that Ayres’s grantors were not Chickasaws entitled to land did *108 not probably destroy such property rights as had become vested, but as to this the court expresses no opinion. The action taken by the Chickasaw legislature, however, is of great value as expressing the contemporaneous sense of a whole nation of civilized people as to the Choctaw status of the Ayres grantors as of the date of the execution of the treaty.
In the face of adverse action all that was necessary for the parties to do was to appeal to the courts for the possession of the land if they had confidence in their evidences of title. Under the rule in Mississippi adverse possession under the patent would not have been a defense against an Indian properly located until the time prescribed by the statute of limitations. (N. O. J. and Great Northern R. Co. v. Moye, 39 Miss., 374.) Ayres knew enough to know that he could not succeed under the equity case of Niles v. Anderson, sufra. But the statute of limitations had not then barred the right of entry of the Indian grantors if they had any such right. Possession had been asserted for two Indians who had conveyed. No explanation is given why possessory proceedings were not taken to the courts by the Indians, and the conclusion is irresistible that it was either because Ayres had not paid for the land or the Indians were unwilling to subject themselves to the results. It was feasible, if Ayres had purchased the land, for him to procure the same kind of authority to bring ejectments in the names of his grantors as was done in the reported cases. Ayres had procured the same certificates; his grantors were then living; there could have been but little difficulty in procuring authority from some at least of his grantors, for the purpose of instituting proceedings. If he had paid for the land, who doubts that many if not all of his grantors would readily have said so and given the necessary authority? The Government became ready to defend its patents whilst witnesses were living, and certainly a trustee ought not now to remove restrictions where the beneficiaries united with the trustee in imposing restrictions that were then thought proper and which time has vindicated as proper. There is no answer to the declaration of the Committee on Private Land Claims of the *109 Senate which investigated many years ago, when it declared that “ Nothing can now supply the title.”
Claimant’s objection to the entry of judgment is not of enough importance for the court here to consider, as the findings have been adverse to Ayres, and the results as to him, whether they appear in the form of findings or in a judgment, are essentially the same. Claimant having voluntarily appeared and litigated the matter — which he was not bound to do — the action of the court is at least an award. (Mason v. United States, 17 Wall., 73.) While the court had great reason to believe that it was the intent of Congress to be guided by the court’s view of the law in determining the existence of a title, and the liability of the Government to pay for the appropriation of the land if the court could find that Ayres really had a title, there was and is room for doubt whether any statement of the court declaring legal grounds for recovery (had a liability been declared) positively meant more than an intention of the legislative body to be morally bound to appropriate. Whether the act of our jurisdiction meant the imposition of the ministerial duty or the exercise of the "judicial function, the intent is the test — not the accidents of language. The ministerial duty excludes mere discretion imposed upon executive officers where under acts requiring certain things to be done by these officers the conflicting decisions mainly- have arisen. Thus, in Kendall v. United States (12 Pet., 593), the Supreme Court said: “ We all agree that no discretionary power in relation to the award was given to the Postmaster-General; and that the duty enjoined upon him was really ministerial.” (Id., 626.) There the act required by the law to be done was a precise definite act purely ministerial because the Postmaster-General ivas simply to credit the relators with the full amount of the award of the Solicitor of the Treasury in adjusting an account. The fact that under the act of March 3, 1887, known as the Tucker Act, either House of Congress might have sent this claim here without a special act affords strong reason for believing that Congress desired an adjudication from the court as a court; and though the phraseology of the act calls *110 for a report, that in itself means nothing under Irwin's case. (127 U. S., 125.) The essential thing remains that the action of this court is nominally on the facts but really on the law in many important particulars, and the intent can not bo attributed to Congress to diminish the exercise of judicial power where by any fair construction of the intent the Supreme Court might on appeal review the action taken . in the matter of any liability declared.
As the right to enter j udgment has never been considered by any member of the court as clear, the motion to set aside the action taken is sustained. The reasons for the action heretofore taken appear in a separate opinion because of the genral importance of the question. (P. 122.)
The findings of fact now filed together with the opinion on the merits and on the motion will be substituted for all former action and be transmitted to Congress.