## G. F. STEARNS LAND & LUMBER CO. v. ASHER et al.

## ASHER et al. v. G. F. STEARNS LAND & LUMBER CO.

(Circuit Court of Appeals, Sixth Circuit. January 18, 1924.)

Nos. 3842, 3843.

1. **Adverse possession ⬅—103—Rule as to adverse possession of claimant under junior grant to limits of senior grant stated.**

Where the claimant under a junior grant actually holds a substantial parcel within the interference between his grant and the senior grant, his adverse possession will be operative by construction to the limits of the junior grant, except as against actual possession under the senior grant.

2. **Adverse possession ⬅—103—Possession by claimant under first and third grants of parcel in interference between second and third, and also within first, not constructive possession to limits of third grant.**

Where there are three grants, the first and the third belonging to the defendant, and the second to the plaintiff, possession by defendant of a parcel which is in the interference between the second and third, and which is also within the first, will be considered as held by him under the first or best title, and will not give him constructive possession to the limits of the third grant.

3. **Limitation of actions ⬅—119(4)—Title by adverse possession, to be available to claimants, who were minors when suit was brought, must have ripened at time of commencement of suit.**

Title by adverse possession, to be available to defendants in ejectment, who were minors when the suit was brought, and who were not served until they reached their majority, must have ripened when the suit was commenced, where their mother in possession of the land was served at the time of the commencement of the action; such action having been commenced as to such minors when the suit was commenced and service was had on their mother, and not when they reached their majority, in view of Ky. St. § 2524.

4. **Adverse possession ⬅—116(7)—Jury should be carefully instructed as to essential characteristics of adverse possession.**

In an action involving question of whether claimant under one grant acquired title by adverse possession to limits of other grant, the jury should be fully and carefully constructed as to the essential characteristics of the possession necessary to give him title.

5. **Adverse possession ⬅—103—Possession by claimant under one grant, to give him title to limits of senior grant, must be sufficiently substantial to charge owner of other patent with notice thereof.**

Possession by claimant under one grant, to give him title by adverse possession to limits of senior grant, must be sufficiently substantial in extent and in publicity or notoriety to charge the owner of the second patent with notice of its existence and character.

6. **Adverse possession ⬅—101—Uniting of several grants into one tract in ejectment suit had no effect on adverse possession during previous 15 years.**

The uniting of separate grants into one parcel, by bringing suit in ejectment and describing the land in dispute as one parcel, surrounded by a single boundary, could have no effect on the construction and effect of an adverse possession running during the previous 15 years.

7. **Adverse possession ⬅—101—Several tracts held not one tract, for purpose of acquiring title by adverse possession.**

Five tracts of land, two of which were united by a substantial connection, and the other three of which were tied on by necks so narrow that only careful surveying and map making could disclose any tie, could

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

not be considered as one tract of land for purpose of acquiring adverse possession, though action in ejectment could be brought, describing them as one tract to avoid a multiplicity of suits.

8. **Public lands** ⬦≫151(6)—Patents valid on face not subject to collateral attack.

Validity of patents issued under Ky. St. §§ 4702–4705, could not be collaterally attacked in ejectment actions on ground of forgery or fraud, where valid on their face.

9. **Appeal and error** ⬦≫1172(4)—Separate judgments for plaintiff and defendants must stand or fall by themselves, on separate proceedings to review each judgment.

Where judgment was rendered for plaintiff in ejectment as to one sub-parcel, and other judgment was rendered for defendants as to other sub-parcels, and the plaintiff brought a writ of error to review the judgment for defendants, and the defendants brought a separate writ of error to review the judgment for plaintiff, the judgment for each party must stand or fall by itself.

In Error to the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Action in ejectment by the G. F. Stearns Land & Lumber Company against John H. Asher and others. Judgment for plaintiff as to certain tract, and for defendants as to certain tract, and both parties bring error. Judgment for plaintiff affirmed, and judgment for defendants reversed, and cause remanded.

Cleon K. Calvert, of Pineville, Ky. (Clifford B. Longley and W. R. Middleton, both of Detroit, Mich., and L. D. Lewis, of Hyden, Ky., on the brief), for plaintiff.

H. C. Clay, of London, Ky., for defendants.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. The Stearns Company claimed title to a tract of land in Leslie county, Ky., through a series of patents issued to De Groot, upon contiguous parcels, in 1870. In 1901 it brought an ejectment suit in the court below to recover a large boundary of land within these De Groot patents, and made defendants thereto numerous members and kin of the Hall and Brown families, as well as some others. The summons was returned, apparently duly served upon all the defendants whose interests are now material. In May, 1902, judgment by default was entered against various defendants; the only one of them whose name is later important being Henry Brown. In November, 1902, a similar default judgment was entered against other defendants, including Polly Asher (a daughter of John H. Hall). Nothing further appears upon the record until 1915, when the plaintiff filed a petition stating that certain of the female defendants, Hall (Asher) and Brown, had, since the filing of the petition, been married, and praying "judgment against said defendants under their respective names as changed by marriage." Upon this amended petition, a summons issued, directed to these defendants by their married names, and running also against four brothers of these female defendants, which

brothers had also been named in the return of service to the original summons.

Thereupon the defendants Asher (except Polly), all grandchildren of John H. Hall and children of Polly Asher, united in an answer and counterclaim. In their answer they did not distinctly challenge plaintiff's paper title under the De Groot patents, but set up adverse and superior claims in themselves, as successors to John H. Hall, of five tracts included within plaintiff's claimed boundary. In the progress of litigation, tract 4 seems to have become unimportant. An amended answer claimed an additional tract, and alleged that all the De Groot patents were void, because based upon forged entry papers. Later, the proofs showed that these defendants claimed tract 1 under a patent granted to John H. Hall, in 1886, tract 2 through possession by John H. Hall under a patent to Preston Hall issued in 1877, and tract 3 under an Asa Gilbert patent issued in 1840. Priority of right to tracts 1 and 2 obviously depended upon the claimed adverse possession by defendants of portions of the interference between the two Hall patents, respectively, and the earlier De Groot patents. The trial of the case before a jury resulted in a verdict by direction of the court for the defendants as to the first tract, and for the plaintiffs as to tract 5 and that in the amended answer, and a verdict by the jury for the defendants for the second tract; it turned out that the third tract seemed to be located within the territory excepted from the boundary claimed by plaintiff, and hence was not involved in this suit, and not mentioned in the verdict.

Each party moved for a new trial, and the court granted both motions. Upon the second trial, the issue of adverse possession as to both tracts 1 and 2 was submitted to the jury which found for defendants as to both; and, again by direction of the court, it found against the defenses based on the alleged forgeries underlying the De Groot Patent, and hence awarded to plaintiffs the same two tracts as on the first trial. Each party brings error.

[1, 2] As to adverse possession, the facts call for the application of the rule, familiar in Kentucky, that where the claimant under a junior grant actually holds a substantial parcel within the interference between his grant and the senior grant, his adverse possession will be operative by construction to the limits of the junior grant, excepting as against actual possession under the senior grant. The case also calls for the application of the further rule, also familiar in Kentucky, that where there are three grants, the first and third belonging to the defendant and the second to the plaintiff, possession by defendant of a parcel which is in the interference between the second and third, and which is also within the first, will be considered as held by him under the first or best title, and will not give him constructive possession to the limits of the third grant.

With regard to the second tract: John Hall owned the Levi Muncey grant of 1864, and by himself or his tenants was in actual possession and cultivation of a substantial field thereon. In 1870 the De Groot patents were so laid down as to cover entirely the Levi Muncey patent, and extend on all sides of it. This cultivated field was from time to

time extended, until it passed over the edges of the Muncey grant onto De Groot. By the maps used on the trial, which were made about 1920, this encroachment then covered a total of five or six acres, divided into three nonconnecting parts (fields 1, 2, and 3). In 1877 a patent was issued in the name of Preston Hall, a minor son of John Hall, which covered a larger tract, entirely surrounding and including the Muncey grant and the encroachments thereover upon the De Groot patents, and, in addition, a further large portion of these De Groot patents. The defendants Asher, the grandchildren of John Hall, claim that from 1877 on he was in actual possession of these encroachments, claiming under the Preston Hall patent, and therefore entitled to claim to the limits of the Preston Hall grant a possession adverse to the De Groot title. The Ashers, however, do not claim as descendants of John Hall, but as purchasers of the Preston Hall grant at an estate sale made in the John Hall administration.

Plaintiff challenges this claim of the Ashers, because it says that John Hall was a stranger to the Preston Hall grant, and could not claim constructive possession under it. This challenge and the answer which is made to it we pass by, without undertaking to decide the questions thereby presented. We assume, also, (but without deciding) that eventually these encroachments over the edges of the Muncey grant were sufficiently substantial in size, notorious in character, and adverse in intent, so that they would constitute an effective basis for a constructive possession to the limits of the Preston Hall grant. This leaves for consideration only the question whether they were sufficiently proved to have existed 15 years before suit was brought. In 1896, at a regular sale in the course of the Hall administration, the court sold to Frank Brown the land covered by the Levi Muncey patent, and conveyed it by the patent description. Brown then went into possession of the Muncey grant and the three escapes or encroachments. The Hall estate and the Ashers treated these three fields as merely incidental to Muncey, and since 1896 have had no possession thereof. Possession thereafter was continued without interruption by the Brown family,[1] and it then ceased to be, and never again became, a possession under color of the Preston Hall patent, which could ripen into a good title to the boundaries of that grant.

The proofs are very vague and unsatisfactory to carry possession of these encroachments, to their present extent, or to any substantial extent, back of, say, 1890. This is so because no one knows just when they developed from small and purposeless or inadvertent overstepping of the Muncey boundaries into a hostile claim large enough to be substantial; but, whatever might be thought of the sufficiency of the testimony to carry the necessary character and extent of possession back of even 30 years before trial, it is clear that it cannot be taken back to 1881—15 years before 1896—so as to have perfected a title in John

---

[1] Henry Brown, the actual occupant in the Brown interests in 1901, was a defendant against whom the original judgment was rendered, and at about that time he surrendered to plaintiff at least a part of these three fields. The Brown title came back to defendants in 1916.

Hall before the sale by his estate.[2]  This consideration alone leads to a necessary holding that defendants failed in their claim of title to the second tract by adverse possession.  Upon this record, a verdict as to it should have been instructed for plaintiff as against the Ashers, excepting as to the "escapes" from Muncey, which the Browns had actually occupied and had not conveyed to plaintiff.

[3] Before going to the first tract, it is necessary to fix a date when, for the purposes of the statute of limitations, this suit was commenced. It appears without dispute that in 1901, when the original petition was filed and the summons issued and served, the present Asher defendants, plaintiffs in the counterclaim, were minor children, and direct service of summons on them probably was never made, but, if so, was invalid.  Service was made upon Polly Asher, their mother.  They had no guardian, excepting as she was their natural guardian, and she was the widow of Robert Asher, who, at the sale in the estate of John Hall, had purchased the John Hall patent, which is the basis of defendant's present claim.  Judgment by default was duly taken against her.  It is the settled Kentucky rule that a suit is commenced, for the purposes of this statute, when a petition is filed and a summons issued (and the latter delivered to the sheriff for service), all in good faith. Ky. St. § 2524; City of Louisville v. Meglemry, 107 Ky. 122, 52 S. W. 1052; Walston v. Louisville (Ky.) 66 S. W. 385.  We see no basis for charging the plaintiff with bad faith in this matter.  If we charge it with full knowledge that the named grandchildren of John Hall were minors, and that the purported service was not good as to them, still it would be true that the mother of these children was their natural guardian, and was in possession, in their right or her own, or both, and that the service upon and judgment against her in an ejectment suit might, in good faith, have been thought sufficient.  There is no proof that defendants are prejudiced by the delay in getting good service until they were adult.  We conclude that the proof of adverse possession, to be effective, must go back until 1886.

There are two localities on the first tract where it is claimed that there had been possession of the necessary character.  One of them is

---

[2] If notice is given to identifying these "escapes" as compared with the main fields on Muncey, and to the vital distinctions between the period before 1881 and that after, typical of all testimony is that of John and Franklin Sparks and Dillion Sizemore.  John Sparks was six years old in 1881; "as long ago as I can remember" the field on the right of the branch at the forks (No. 3) had a half acre in it; it has been "enlarged since."  That acreage would not overstep the Muncey line.  At the same time there was "a little small field, it might have been two acres, on the right at the mouth" (No. 2).  This would have been partly outside of Muncey;  but definite recollection of such matters can hardly go back to the age of six.  Franklin Sparks says that a house occupied by Smith under Hall at the forks (No. 3) was over the Muncey line;  but he fixes no date, and the map shows that any house located where he says this was would have been barely over the line, if at all.  He says that "at that time" field 2 was "just a little strip" running up as far as the house (which was supposed to be on Muncey and was so treated on the sale to Brown).  Dillion Sizemore says he has lived in the neighborhood only since 1884;  that "40 years ago" (1881) there was no clearing on the right of the branch (No. 3);  that the house and clearing then at the mouth (No. 2?) was on Muncey.

called field 4, and the other fields 7 and 8. Whether there is any evidence sufficient to go to the jury to establish this possession is not satisfactorily clear. Counsel for defendants suggest that much of the force of the testimony has been lost by condensing it into narrative form. We must take the record as we find it; but this suggestion and other circumstances in the case add to our hesitation in reaching a positive conclusion. Since the case must go back for a new trial, upon which the evidence is likely to be more carefully and fully developed, we now refrain from any definite ruling. We should, however, mention our view of some matters which will arise upon the new trial.

Field 4, the sassafras field, constituted at the time the maps were made a 4 or 5 acre encroachment or escape from a large field owned by John Hall under a patent senior to De Groot. Just how much, if any, of this escape existed in 1886, is left, so far as we can find from the printed record, without any proof. Polly Asher testifies to the holding of possession here by her father, John Hall; but no times or lines are definitely fixed. John Asher, her son, testifies that when he can first remember (not earlier than 1896; he was born in 1890) the occupation extended only as far west as the "walnut corner." How much, if any, that leaves of this encroachment existing prior to 1896, it is impossible for us to say. The matter can probably be made definite. The John Hall patent, which is the one under which adverse possession of the first tract is claimed, was issued in 1886.

Fields 7 and 8 lie mostly within the Mosely patent of 1859, which also belonged to John Hall, and which is entirely surrounded both by the De Groot patents of 1870 and the John Hall patent of 1886. Clearly, so far as these fields are within the Mosely patent, they cannot be considered as held under the John Hall patent. On the northern boundary they escape over the northerly limit of the Mosely patent, and on to the De Groot patent and John Hall patent, to an extent of 4 or 5 acres in the aggregate. Here again the testimony is very vague as to the date when this encroachment or escape became substantial enough to be adverse in every essential, and thus the basis of constructive possession to the whole John Hall grant. We assume, for the present, that it is sufficiently carried back of 1886; but we intimate no opinion thereon. If so, we come to the effect of the Asa Gilbert grant. This was a 50-acre patent, issued in 1840, and also belonged to John Hall. So far as his escape over the northerly line of the Mosely patent still kept within the limits of the Gilbert tract, it could not support any claim of adverse possession under the John Hall grant against De Groot. The map made by plaintiff's surveyor in preparation for the first trial so located the Gilbert grant that it covered all of this escape, excepting what seems to be an almost negligible spot. It was the property described in the Gilbert grant, which defendants claimed by their answer as the third tract to which they were entitled, and they went through the first trial, accepting the propriety of the location shown for the Gilbert grant on plaintiff's map. On the second trial, now under review, when this same map was offered in evidence and the method of its making described by the surveyor, it appeared that he located the Gilbert tract by getting his beginning point from a statement made to

him by an old resident of the vicinity, who was still living, at the time of the trial. On objection by defendants, the trial court ruled that such information was not a valid basis of proof to support a survey, and hence the Gilbert tract apparently was given no effect on the second trial as to the effect of defendants' possession of this escape. Upon the new trial, to be had, this situation probably will not arise again. If the old resident is living, he can be brought as a witness; if he is dead, the objection is cured. If, however, the question does arise, the effect which defendants' claim of right to the field under the Gilbert patent— a claim apparently once successfully maintained—may have upon a claim of the same field under the John Hall patent must have attention.

[4, 5] We think that in adverse possession cases of this character, where the occupation of the main field has been under a title superior to both the contesting patents, and the possession within the interference between the two latter has been only by what we have called an "escape" over the true line of the first grant, the jury should be fully and carefully instructed as to the essential characteristics of this possession. Clearly it must be with intent to claim title under the third grant, and not be merely an inaccurate location of the line of the first or a careless or inadvertent wandering beyond it. It must also be sufficiently substantial in extent and in publicity or notoriety to charge the owner of the second patent with notice of its existence and character; and upon this point the nature of the country and the facilities which the public, including the owner of the second grant, would have for observing and rightly judging the escape, as well as any apparent intent to follow the line of defendant's oldest grant, like Mosely, would be of importance. This question is fairly raised upon the present record by plaintiff's exception to the failure to charge upon the subject of intent. The court had given to the jury only the fundamental rules as to the essentials of adverse possession, but without the elaboration which would be suitable to this situation.

The court charged in effect that the several contiguous De Groot grants claimed by plaintiff and sought to be recovered in this suit so far constituted one tract or parcel of land that an adverse possession by defendants, under a junior grant, of any parcel of the interference would extend defendants' possession to the limits of the junior grant, wherever they went within this composite, but unitary, parcel thus held by the plaintiff. This is said to be error, because plaintiff contends that the constructive effect of such adverse possession would be limited by the bounds of the particular De Groot grant, within which the actual possession occurred. It has been held in Kentucky, in favor of the junior title claiming to extend constructive possession to the limits of its boundaries, that where title to what were originally separate grants comes to this claimant by one deed, even though the parcels were separately described therein, the entire boundary conveyed by the deed, if the parcels are all contiguous, is to be considered one tract for the purpose of carrying such constructive adverse possession to the limits thereof. Parsons v. Dills, 159 Ky. 471, 167 S. W. 415.

Coming to the question from its other aspect, it was also held—and as it happens as to some of these contemporaneous very De Groot grants

—that the simultaneous ownership by Elliott of four contiguous De Groot grants did not so far make them one parcel as to subject the other three of them to loss by the adverse possession of the junior claimant who occupied a parcel on only one of them, even though his junior grant covered all four. Elliott v. Hensley, 188 Ky. 444, 222 S. W. 507. It is pointed out in this case that an actual inclosure of these four grants by fence would have made them one parcel, with this burdensome effect, but that merely common ownership did not. The opinion does not show whether the four De Groot grants came to Elliott by one conveyance, or whether, if they had, that would have led to a different result, though the court quotes with apparent approval from 1 R. C. L. p. 729, the statement that the constructive possession (188 Ky. 450, 222 S. W. 509) "does not extend to other and distinct parcels, even though they are contiguous and are conveyed to the claimant by the same person and at one time."

On the same page, and in stating the reason for its conclusion, the Kentucky court says:

"If the owner of these De Groot patents should have found an intruder in actual possession of a part of one of them, it would not bring home to him any notice whatever that the intruder had asserted or would assert a hostile claim to the other adjoining patents, outside of the one in which he had settled."

[6] In the present case it appears that title came to the plaintiff in 1886 by one deed which conveyed, "with other lands, the lands embraced in the patents above specified." The deed is not copied, but we may safely infer that it described the patent tracts successively, each by itself. The presence of "with other lands" would by itself seem fatal to the theory that these lands were then merged into one tract. No uniting of these separate De Groot grants into one parcel, by any means, appears until it was to some extent done by the plaintiff in bringing this single suit and therein describing the land in dispute as one parcel surrounded by a single boundary. Clearly this act, committed in 1901, could have no effect upon the construction and effect of an adverse possession said to have been running during the previous fifteen years.

It is the claiming of the whole tract, as one, by a junior claimant, rather than a deed to him like this, that makes it one for the affirmative purpose of characterizing his claim. A senior grantee, until he brings his ejectment suit, is doing no corresponding act to merge his parcels.

[7] Further, no inspection of this conveyance to plaintiff would disclose that the patents were all necessarily contiguous. They excepted prior grants, and whether these exceptions would destroy contiguity was a problem. It happens that, as shown by reference to the map, the boundary described in the petition seems to comprise five tracts. Two of them are united by a substantial connection. The other three are tied on by necks so narrow that only careful surveying and map making disclose any tie. To call them one tract is permissible to avoid multiplicity of suits; it ought not to be, for purposes of destroying the better title.

Under the facts here, we think the court's instructions on this subject were erroneous.

The cross-writ of error attacks the entire De Groot title, because of the alleged forgery of the county court orders underlying the patents. The statute in force in 1870 was the act of July 1, 1852 (Rev. St. Ky. 1852, c. 102); sections 4702–4705, Carroll's Revised Statutes of 1922. See also section 3, set out in full in Lockard v. Asher Lumber Co., 131 Fed. 690, 65 C. C. A. 518. Section 1 gives each county the right to dispose of vacant and unoccupied lands within its borders. Section 3 prescribes the procedure, and directs that the appropriator make an application to the county court, and, on the paying of the price fixed, may obtain an order authorizing him to enter' and survey a specified quantity of land; that the survey should be made in a certain manner; that the surveyor make a plat and certificate of the survey; that the original plat and survey and a copy of the court order, must be deposited in the office of the register (of the state land office); and that the patent may issue after this filing in the register's office of the plat and certificate and copy of the order. In this case the allegation is made that the copies so presented to the state were forged and that no such record existed in the county court. In answer to this, it is urged that the present attack is collateral and that a patent cannot be so defeated. The last statement of the rule by the Court of Appeals of Kentucky seems to be that in Mason v. Fuson, 171 Ky. 111, 186 S. W. 891, where it is said:

"While, ordinarily, the validity of a patent cannot be collaterally attacked, there are at least three exceptions to this general rule, as where the patent is void upon its face, or has been issued in contravention of a statute which declares that the issuance of the patent under the circumstances prohibited shall render it void, or where it is issued under circumstances which the statute declares to be fraudulent."

[8] Applying this rule it is clear that these De Groot patents are not void upon their face, and that there is no statute which declares that a patent issued under the circumstances alleged shall be void. The first two exceptions named in Mason v. Fuson may therefore be disregarded. The third exception is that it "is issued under circumstances which the statute declares to be fraudulent." There is no expressed declaration in the statute that the circumstances here alleged would be fraudulent; but perhaps that definition might be assumed. However, they are no more fraudulent than would be any other deliberately concealed noncompliance with the conditions—as for example, entering land which was not vacant (clause 8), entering land forfeited for taxes (11), including more than 200 acres (section 3), or basing the entry upon a survey not actually made on the ground (2). It is the clear holding of or inference from the very numerous Kentucky decisions that the objection of noncompliance in any of these particulars can be made only on direct attack, and we see no reason why the existence of fraud in respect to any one of them should change the rule. No Kentucky decision is found which is to this effect. Bryant v. Kentucky Co., 144 Ky. 755, 139 S. W. 1089, and similar cases, are only to the effect that the records in the land office of papers referred to in the patent become part of it, and so make the patent void on its face if they show a lack of authority for the issue. In the statute now involved, the only pre-

requisite to the issue of the patent was the existence on the register's record of the certificate and the attested copy of order. In their presence the duty to issue the patent was clear. We therefore affirm the ruling below that the attack tendered on the ground of forgery of the orders could not be considered.[3]

The question of the period of limitations, raised on the cross-writ of error, is disposed of by what has been said above.

[9] We have here a single ejectment suit, brought by the plaintiff as if for one parcel, and a judgment for the plaintiff for certain portions of it found to be without error, and a judgment for portions in favor of defendants found to require vacation and a new trial. Defendants justified under three separate and distinct claims as to their subparcels 1, 2, and 5, respectively. Verdicts and judgments for plaintiff as to 5, and for defendants as to 1 and 2, were the results of a single trial, and were united in one journal entry. Plaintiff brought a writ of error against the judgment for defendants, and they brought a separate writ to review the judgment for plaintiff. Three separate suits might have been originally brought, and we think such a judgment practically works severance of the single action into at least two, and that as to proceedings thereafter the judgment for each party must stand or fall by itself. This is emphasized by the fact that in this case the defendants brought a separate writ of error. The case is not one of a suit upon a single cause of action, with varying results as to different items of damages claimed, as was Kean v. Nat. City Bank, 294 Fed. 214, decided by this court November 12, 1923; but it is rather to be classified with National Surety Co. v. United States (C. C. A. 6) 228 Fed. 577, 587, 143 C. C. A. 99, L. R. A. 1917A, 336.

Our conclusion, therefore, is that upon the writ of error in No. 3843 the judgment of the court below in favor of the plaintiff and against the defendants be affirmed, and that upon the writ of error in No. 3842, the judgment of the court below in favor of the defendants and against the plaintiff be reversed, and the cause be remanded for a new trial, in accordance with this opinion, as to defendants' parcels 1 and 2.

Each party will pay half of the total costs of this court upon the two writs of error.

---

[3] In Doolan v. Carr, 125 U. S. 618, 8 Sup. Ct. 1228, 31 L. Ed. 844, a patent was collaterally impeached because the land covered was not public land, and hence the United States had no power to grant it. In the leading case of Polk v. Wendal, 9 Cranch, 87, 3 L. Ed. 665, the nonexistence of the original warrants (they were forged) was held to make the patent void on collateral attack, because the statute of North Carolina then in force expressly declared void any patent not obtained in the manner directed by the act or by disregard of any of its provisions; and there was a similar holding as to the nonexistence of an entry because the grant by North Carolina was after the cession of the land to the United States, and the patentee was obliged to show a precedent entry in order to bring the apparently void grant within a reservation in the act of cession.